# EMPORIUM CAPWELL CO. *v.* WESTERN ADDITION COMMUNITY ORGANIZATION ET AL.

No. 73–696.   Argued October 22, 1974—Decided February 18, 1975*

*Together with No. 73–830, *National Labor Relations Board* v. *Western Addition Community Organization et al.*, also on certiorari to the same court.

*George O. Bahrs* argued the cause and filed briefs for petitioner in No. 73–696. *Deputy Solicitor General Wallace* argued the cause for petitioner in No. 73–830. With him on the briefs were *Solicitor General Bork, Keith A. Jones, Peter G. Nash, John S. Irving, Patrick Hardin, Norton J. Come,* and *Linda Sher.*

*Kenneth Hecht* argued the cause for respondent Western Addition Community Organization in both cases. With him on the brief were *Edward H. Steinman* and *Lee M. Modjeska.*†

---

†Briefs of *amici curiae* urging reversal in both cases were filed by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the Ameri-

Opinion of the Court by MR. JUSTICE MARSHALL, announced by MR. CHIEF JUSTICE BURGER.

This litigation presents the question whether, in light of the national policy against racial discrimination in employment, the National Labor Relations Act protects concerted activity by a group of minority employees to bargain with their employer over issues of employment discrimination. The National Labor Relations Board held that the employees could not circumvent their elected representative to engage in such bargaining. The Court of Appeals for the District of Columbia Circuit reversed and remanded, holding that in certain circumstances the activity would be protected. 158 U. S. App. D. C. 138, 485 F. 2d 917. Because of the importance of the issue to the administration of the Act, we granted certiorari. 415 U. S. 913. We now reverse.

I

The Emporium Capwell Co. (Company) operates a department store in San Francisco. At all times relevant to this litigation it was a party to the collective-bargaining agreement negotiated by the San Francisco Retailer's Council, of which it was a member, and the

can Federation of Labor and Congress of Industrial Organizations; by *Gerard C. Smetana, Lawrence M. Cohen, Jeffrey S. Goldman,* and *Milton A. Smith* for the Chamber of Commerce of the United States; and by *Ira M. Millstein* for the National Retail Merchants Assn., Inc.

*Fletcher Farrington* and *Nathaniel R. Jones* filed a brief for the National Association for the Advancement of Colored People as *amicus curiae* urging affirmance in both cases.

Briefs of *amici curiae* in both cases were filed by *Dennis G. Lyons, David Bonderman,* and *J. Harold Flannery* for the National Urban League et al.; by *Lutz Alexander Prager* for the Wayne State University Clinical Law Program in Employment Discrimination; and by the Department Store Employees Union, Local 1100.

Department Store Employees Union (Union) which represented all stock and marking area employees of the Company. The agreement, in which the Union was recognized as the sole collective-bargaining agency for all covered employees, prohibited employment discrimination by reason of race, color, creed, national origin, age, or sex, as well as union activity. It had a no-strike or lockout clause, and it established grievance and arbitration machinery for processing any claimed violation of the contract, including a violation of the antidiscrimination clause.[1]

On April 3, 1968, a group of Company employees covered by the agreement met with the secretary-treasurer of the Union, Walter Johnson, to present a list of grievances including a claim that the Company was discriminating on the basis of race in making assignments and promotions. The Union official agreed to take certain of the grievances and to investigate the charge of racial discrimination. He appointed an investigating committee and prepared a report on the employees' grievances, which he submitted to the Retailer's Council and which the Council in turn referred to the Company. The report described "the possibility of racial discrimination" as perhaps the most important issue raised by the employees and termed the situation at the Company as

---

[1] Section 5B provided:

"Any act of any employer, representative of the Union, or any employe that is interfering with the faithful performance of this agreement, or a harmonious relationship between the employers and the UNION, may be referred to the Adjustment Board for such action as the Adjustment Board deems proper, and is permissive within this agreement." App. 100–101.

Section 36B established an Adjustment Board consisting of three Union and three management members. Section 36C provided that if any matter referred to the Adjustment Board remained unsettled after seven days, either party could insist that the dispute be submitted to final and binding arbitration. App. 101–102.

potentially explosive if corrective action were not taken. It offered as an example of the problem the Company's failure to promote a Negro stock employee regarded by other employees as an outstanding candidate but a victim of racial discrimination.

Shortly after receiving the report, the Company's labor relations director met with Union representatives and agreed to "look into the matter" of discrimination and see what needed to be done. Apparently unsatisfied with these representations, the Union held a meeting in September attended by Union officials, Company employees, and representatives of the California Fair Employment Practices Committee (FEPC) and the local antipoverty agency. The secretary-treasurer of the Union announced that the Union had concluded that the Company was discriminating, and that it would process every such grievance through to arbitration if necessary. Testimony about the Company's practices was taken and transcribed by a court reporter, and the next day the Union notified the Company of its formal charge and demanded that the joint union-management Adjustment Board be convened "to hear the entire case."

At the September meeting some of the Company's employees had expressed their view that the contract procedures were inadequate to handle a systemic grievance of this sort; they suggested that the Union instead begin picketing the store in protest. Johnson explained that the collective agreement bound the Union to its processes and expressed his view that successful grievants would be helping not only themselves but all others who might be the victims of invidious discrimination as well. The FEPC and antipoverty agency representatives offered the same advice. Nonetheless, when the Adjustment Board meeting convened on October 16, James Joseph Hollins, Tom Hawkins, and two other employees whose

testimony the Union had intended to elicit refused to participate in the grievance procedure. Instead, Hollins read a statement objecting to reliance on correction of individual inequities as an approach to the problem of discrimination at the store and demanding that the president of the Company meet with the four protestants to work out a broader agreement for dealing with the issue as they saw it. The four employees then walked out of the hearing.

Hollins attempted to discuss the question of racial discrimination with the Company president shortly after the incidents of October 16. The president refused to be drawn into such a discussion but suggested to Hollins that he see the personnel director about the matter. Hollins, who had spoken to the personnel director before, made no effort to do so again. Rather, he and Hawkins and several other dissident employees held a press conference on October 22 at which they denounced the store's employment policy as racist, reiterated their desire to deal directly with "the top management" of the Company over minority employment conditions, and announced their intention to picket and institute a boycott of the store. On Saturday, November 2, Hollins, Hawkins, and at least two other employees picketed the store throughout the day and distributed at the entrance handbills urging consumers not to patronize the store.[2] Johnson

---

[2] The full text of the handbill read:

"* * BEWARE * * * * BEWARE * * * * BEWARE * *

"EMPORIUM SHOPPERS

" 'Boycott Is On' 'Boycott Is On' 'Boycott Is On'

"For years at The Emporium black, brown, yellow and red people have worked at the lowest jobs, at the lowest levels. Time and time again we have seen intelligent, hard working brothers and sisters denied promotions and respect.

"The Emporium is a 20th Century colonial plantation. The

encountered the picketing employees, again urged them to rely on the grievance process, and warned that they might be fired for their activities. The pickets, however, were not dissuaded, and they continued to press their demand to deal directly with the Company president.[3]

On November 7, Hollins and Hawkins were given written warnings that a repetition of the picketing or public statements about the Company could lead to their discharge.[4] When the conduct was repeated the following Saturday, the two employees were fired.

---

brothers and sisters are being treated the same way as our brothers are being treated in the slave mines of Africa.

"Whenever the racist pig at The Emporium injures or harms a black sister or brother, they injure and insult all black people. THE EMPORIUM MUST PAY FOR THESE INSULTS. Therefore, we encourage all of our people to take their money out of this racist store, until black people have full employment and are promoted justly through out The Emporium.

"We welcome the support of our brothers and sisters from the churches, unions, sororities, fraternities, social clubs, Afro-American Institute, Black Panther Party, W. A. C. O. and the Poor Peoples Institute." App. 107.

[3] Johnson testified that Hollins "informed me that the only one they wanted to talk to was Mr. Batchelder [the Company president] and I informed him that we had concluded negotiations in 1967 and I was a spokesman for the union and represented a few thousand clerks and I have never met Mr. Batchelder . . . ." App. 76.

[4] The warning given to Hollins read:

"On October 22, 1968, you issued a public statement at a press conference to which all newspapers, radio, and TV stations were invited. The contents of this statement were substantially the same as those set forth in the sheet attached. This statement was broadcast on Channel 2 on October 22, 1968 and Station KDIA.

"On November 2nd you distributed copies of the attached statement to Negro customers and prospective customers, and to other persons passing by in front of The Emporium.

"These statements are untrue and are intended to and will, if continued injure the reputation of The Emporium.

"There are ample legal remedies to correct any discrimination you

Western Addition Community Organization (hereinafter respondent), a local civil rights association of which Hollins and Hawkins were members, filed a charge against the Company with the National Labor Relations Board. The Board's General Counsel subsequently issued a complaint alleging that in discharging the two the Company had violated § 8 (a)(1) of the National Labor Relations Act, as amended, 61 Stat. 140, 29 U. S. C. § 158 (a)(1). After a hearing, the NLRB Trial Examiner found that the discharged employees had believed in good faith that the Company was discriminating against minority employees, and that they had resorted to concerted activity on the basis of that belief. He concluded, however, that their activity was not protected by § 7 of the Act and that their discharges did not, therefore, violate § 8 (a)(1).

The Board, after oral argument, adopted the findings and conclusions of its Trial Examiner and dismissed the complaint. 192 N. L. R. B. 173. Among the findings adopted by the Board was that the discharged employees' course of conduct

> "was no mere presentation of a grievance but nothing short of a demand that the [Company] bargain with the picketing employees for the entire group of minority employees." [5]

may claim to exist. Therefore, we view your activities as a deliberate and unjustified attempt to injure your employer.

"This is to inform you that you may be discharged if you repeat any of the above acts or make any similar public statement."

That given to Hawkins was the same except that the first paragraph was not included. *Id.*, at 106.

[5] 192 N. L. R. B., at 185. The evidence marshaled in support of this finding consisted of Hollins' meeting with the Company president in which he said that he wanted to discuss the problem perceived by minority employees; his statement that the pickets would not desist until the president treated with them; Hawkins' testimony that their purpose in picketing was to "talk to the top management to get better conditions"; and his statement that they wanted to

The Board concluded that protection of such an attempt to bargain would undermine the statutory system of bargaining through an exclusive, elected representative, impede elected unions' efforts at bettering the working conditions of minority employees, "and place on the Employer an unreasonable burden of attempting to placate self-designated representatives of minority groups while abiding by the terms of a valid bargaining agreement and attempting in good faith to meet whatever demands the bargaining representative put forth under that agreement." [6]

On respondent's petition for review the Court of Appeals reversed and remanded. The court was of the view that concerted activity directed against racial discrimination enjoys a "unique status" by virtue of the national labor policy against discrimination, as expressed in both the NLRA, see *United Packinghouse Workers v. NLRB*, 135 U. S. App. D. C. 111, 416 F. 2d 1126, cert. denied, 396 U. S. 903 (1969), and in Title VII of the

---

achieve their purpose through "group talk and through the president if we could talk to him," as opposed to use of the grievance-arbitration machinery.

[6] The Board considered but stopped short of resolving the question of whether the employees' invective and call for a boycott of the Company bespoke so malicious an attempt to harm their employer as to deprive them of the protection of the Act. The Board decision is therefore grounded squarely on the view that a minority group member may not bypass the Union and bargain directly over matters affecting minority employees, and not at all on the tactics used in this particular attempt to obtain such bargaining.

Member Jenkins dissented on the ground that the employees' activity was protected by § 7 because it concerned the terms and conditions of their employment. Member Brown agreed but expressly relied upon his view that the facts revealed no attempt to bargain "but simply to urge [the Company] to take action to correct conditions of racial discrimination which the employees reasonably believed existed at the Emporium." 192 N. L. R. B., at 179.

Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.,* and that the Board had not adequately taken account of the necessity to accommodate the exclusive bargaining principle of the NLRA to the national policy of protecting action taken in opposition to discrimination from employer retaliation.[7] The court recognized that protection of the minority-group concerted activity involved in this case would interfere to some extent with the orderly collective-bargaining process, but it considered the disruptive effect on that process to be outweighed where protection of minority activity is necessary to full and immediate realization of the policy against discrimination. In formulating a standard for distinguishing between protected and unprotected activity, the majority held that the "Board should inquire, in cases such as this, whether the union was actually remedying the discrimination to the *fullest extent possible, by the most expedi-*

---

[7] Section 9 (a) of the NLRA, 29 U. S. C. § 159 (a), provides in part:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ."

Section 704 (a) of Title VII, 42 U. S. C. § 2000e–3 (a) (1970 ed., Supp. III), provides:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual; or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*ent and efficacious means.* Where the union's efforts fall short of this high standard, the minority group's concerted activities cannot lose [their] section 7 protection." [8] Accordingly, the court remanded the case for the Board to make this determination and, if it found in favor of the employees, to consider whether their particular tactics were so disloyal to their employer as to deprive them of § 7 protection under our decision in *NLRB* v. *Electrical Workers,* 346 U. S. 464 (1953). [9]

## II

Before turning to the central questions of labor policy raised by these cases, it is important to have firmly in mind the character of the underlying conduct to which we apply them. As stated, the Trial Examiner and the Board found that the employees were discharged for attempting to bargain with the Company over the terms and conditions of employment as they affected racial minorities. Although the Court of Appeals expressly declined to set aside this finding, [10] respondent has de-

---

[8] 158 U. S. App. D. C., at 152, 485 F. 2d, at 931 (emphasis in original). We hasten to point out that it had never been determined in any forum, at least as of the time that Hollins and Hawkins engaged in the activity for which they were discharged, that the Company had engaged in any discriminatory conduct. The Board found that the employees believed that the Company had done so, but that no evidence introduced in defense of their resort to self-help supported this belief.

[9] Judge Wyzanski dissented insofar as the Board was directed on remand to evaluate the adequacy of the Union's efforts in opposing discrimination. He was of the view that minority concerted activity against discrimination would be protected regardless of the Union's efforts.

[10] *Id.,* at 150 n. 34, 485 F. 2d, at 929 n. 34 (majority opinion); *id.,* at 158, 485 F. 2d, at 937 (dissenting opinion) ("There could not be a plainer instance of an attempt to bargain respecting working conditions, as distinguished from an adjustment of grievances").

voted considerable effort to attacking it in this Court,[11] on the theory that the employees were attempting only to present a grievance to their employer within the meaning of the first proviso to § 9 (a).[12] We see no occasion to disturb the finding of the Board. *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474, 491 (1951). The issue, then, is whether such attempts to engage in separate bargaining are protected by § 7 of the Act or proscribed by § 9 (a).

## A

Section 7 affirmatively guarantees employees the most basic rights of industrial self-determination, "the right

---

[11] Brief for Respondent 27–34; Tr. of Oral Arg. 34, 37–40, 44, 49.

[12] That proviso states:

"That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect . . . ."

Respondent clearly misapprehends the nature of the "right" conferred by this section. The intendment of the proviso is to permit employees to present grievances and to authorize the employer to entertain them without opening itself to liability for dealing directly with employees in derogation of the duty to bargain only with the exclusive bargaining representative, a violation of § 8 (a)(5). H. R. Rep. No. 245, 80th Cong., 1st Sess., 7 (1947); H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. (House managers' statement), 46 (1947). The Act nowhere protects this "right" by making it an unfair labor practice for an employer to refuse to entertain such a presentation, nor can it be read to authorize resort to economic coercion. This matter is fully explicated in *Black-Clawson Co.* v. *Machinists,* 313 F. 2d 179 (CA2 1962). See also *Republic Steel* v. *Maddox,* 379 U. S. 650 (1965). If the employees'· activity in the present litigation is to be deemed protected, therefore, it must be so by reason of the reading given to the main part of § 9 (a), in light of Title VII and the national policy against employment discrimination, and not by burdening the proviso to that section with a load it was not meant to carry.

to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," as well as the right to refrain from these activities. These are, for the most part, collective rights, rights to act in concert with one's fellow employees; they are protected not for their own sake but as an instrument of the national labor policy of minimizing industrial strife "by encouraging the practice and procedure of collective bargaining." 29 U. S. C. § 151.

Central to the policy of fostering collective bargaining, where the employees elect that course, is the principle of majority rule. See *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937). If the majority of a unit chooses union representation, the NLRA permits it to bargain with its employer to make union membership a condition of employment, thereby imposing its choice upon the minority. 29 U. S. C. §§ 157, 158 (a)(3). In establishing a regime of majority rule, Congress sought to secure to all members of the unit the benefits of their collective strength and bargaining power,[13] in full awareness that the superior strength of some individuals or groups might be subordinated to the interest of the majority. *Vaca* v. *Sipes,* 386 U. S. 171, 182 (1967); *J. I. Case Co.* v. *NLRB,* 321 U. S. 332, 338–339 (1944); H. R. Rep. No. 972, 74th Cong., 1st Sess., 18 (1935). As a result, "[t]he complete satisfaction of all who are represented is hardly to be expected." *Ford Motor Co.* v. *Huffman,* 345 U. S. 330, 338 (1953).

---

[13] In introducing the bill that became the NLRA, Senator Wagner said of the provisions establishing majority rule: "Without them the phrase 'collective bargaining' is devoid of meaning, and the very few unfair employers are encouraged to divide their workers against themselves." 79 Cong. Rec. 2372 (1935).

The Court most recently had occasion to re-examine the underpinnings of the majoritarian principle in *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175 (1967). In that case employees in two local unions had struck their common employer to enforce their bargaining demands for a new contract. In each local at least the two-thirds majority required by the constitution of the international union had voted for the strike, but some members nonetheless crossed the picket lines and continued to work. When the union later tried and fined these members, the employer charged that it had violated § 8 (b)(1)(A) by restraining or coercing the employees in the exercise of their § 7 right to refrain from concerted activities. In holding that the unions had not committed an unfair labor practice by disciplining the dissident members, we approached the literal language of § 8 (b)(1)(A) with an eye to the policy within which it must be read:

"National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees. 'Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents . . . .' *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192, 202. Thus only the union may contract the employee's terms and conditions of employment, and provisions for processing his grievances; the union may even bargain away

his right to strike during the contract term . . . ."
388 U. S., at 180 (footnotes omitted).[14]

In vesting the representatives of the majority with this broad power Congress did not, of course, authorize a tyranny of the majority over minority interests. First, it confined the exercise of these powers to the context of a "unit appropriate for the purposes of collective bargaining," *i. e.*, a group of employees with a sufficient commonality of circumstances to ensure against the submergence of a minority with distinctively different interests in the terms and conditions of their employment. See *Chemical Workers* v. *Pittsburgh Glass,* 404 U. S. 157, 171 (1971). Second, it undertook in the 1959 Landrum-Griffin amendments, 73 Stat. 519, to assure that minority voices are heard as they are in the functioning of a democratic institution. Third, we have held, by the very nature of the exclusive bargaining representative's status as representative of *all* unit employees, Congress implicitly imposed upon it a duty fairly and in good faith to represent the interests of minorities within the unit. *Vaca* v. *Sipes, supra; Wallace Corp.* v. *NLRB,* 323 U. S. 248 (1944) ; cf. *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192 (1944). And the Board has taken the position that a union's refusal to process grievances against racial discrimination, in violation of that duty, is an unfair labor practice. *Hughes Tool Co.,* 147 N. L. R. B. 1573 (1964) ; see *Miranda Fuel Co.,* 140 N. L. R. B. 181 (1962), enforcement denied, 326 F. 2d 172 (CA2 1963). Indeed, the Board has ordered a union implicated by a collective-bargaining agreement in discrimination with an employer to propose specific contractual provisions to prohibit racial discrimination. See *Local Union No. 12, United*

---

[14] The Union may not, of course, bargain away the employees' statutory right to choose a new, or to have no, bargaining representative. See *NLRB* v. *Magnavox Co.,* 415 U. S. 322 (1974).

*Rubber Workers of America* v. *NLRB,* 368 F. 2d 12 (CA5 1966) (enforcement granted).

## B

Against this background of long and consistent adherence to the principle of exclusive representation tempered by safeguards for the protection of minority interests, respondent urges this Court to fashion a limited exception to that principle: employees who seek to bargain separately with their employer as to the elimination of racially discriminatory employment practices peculiarly affecting them,[15] should be free from the constraints of the exclusivity principle of § 9 (a). Essentially because established procedures under Title VII or, as in this case, a grievance machinery, are too time consuming, the national labor policy against discrimination requires this exception, respondent argues, and its adoption would not unduly compromise the legitimate interests of either unions or employers.[16]

---

[15] As respondent conceded at oral argument, the rule it espouses here would necessarily have equal application to any identifiable group of employees—racial or religious groups, women, etc.—that reasonably believed themselves to be the object of invidious discrimination by their employer. Tr. of Oral Arg. 30–31. As seemingly limited by the Court of Appeals, however, such a group would have to give their elected representative an opportunity to adjust the matter in some way before resorting to self-help.

[16] Our analysis of respondent's argument in favor of the exception makes it unnecessary either to accept or reject its factual predicate, *viz.,* that the procedures now established for the elimination of discrimination in employment are too cumbersome to be effective. We note, however, that the present record provides no support for the proposition. Thus, while respondent stresses the fact that Hollins and Hawkins had brought their evidence of discrimination to the Union in April 1968 but did not resort to self-help until the following October, it overlooks the fact that although they had been in contact with the state FEPC they did not file a charge with that agency or the Equal Employment Opportunity Commission (EEOC). Fur-

Plainly, national labor policy embodies the principles of nondiscrimination as a matter of highest priority, *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 47 (1974), and it is a commonplace that we must construe the NLRA in light of the broad national labor policy of which it is a part. See *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, 456–458 (1957). These general principles do not aid respondent, however, as it is far from clear that separate bargaining is necessary to help eliminate discrimination. Indeed, as the facts of this litigation demonstrate, the proposed remedy might have just the opposite effect. The collective-bargaining agreement involved here prohibited without qualification all manner of invidious discrimination and made any claimed violation a grievable issue. The grievance procedure is directed precisely at determining whether discrimination has occurred.[17] That orderly determination, if affirmative, could lead to an arbitral award enforceable in court.[18] Nor is there any reason to believe that the processing of grievances is inherently limited to the correction of individual cases of discrimination. Quite apart from the essentially contractual question of whether the Union could grieve against a "pattern or practice" it deems inconsistent with

ther, when they abandoned the procedures to which the Union was bound because they thought "the union was sort of putting us off and on and was going into a lot of delay that we felt was unnecessary," App. 26, it was at the very moment that the Adjustment Board had been convened to hear their testimony.

[17] The Union in this case had been "prepared to go into arbitration" to enforce its position, but was advised by its attorney that it would be difficult to do so without the dissident members' testimony. Testimony of Walter Johnson, App. 76.

[18] Even if the arbitral decision denies the putative discriminatee's complaint his access to the processes of Title VII and thereby to the federal courts is not foreclosed. *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36 (1974).

the nondiscrimination clause of the contract, one would hardly expect an employer to continue in effect an employment practice that routinely results in adverse arbitral decisions.[19]

The decision by a handful of employees to bypass the grievance procedure in favor of attempting to bargain with their employer, by contrast, may or may not be predicated upon the actual existence of discrimination. An employer confronted with bargaining demands from each of several minority groups would not necessarily, or even probably, be able to agree to remedial steps satisfactory to all at once. Competing claims on the employer's ability to accommodate each group's demands, *e. g.*, for reassignments and promotions to a limited number of positions, could only set one group against the other even if it is not the employer's intention to divide and overcome them. Having divided themselves, the minority employees will not be in position to advance their cause unless it be by recourse seriatim to economic coercion, which can only have the effect of further dividing them along racial or other lines.[20] Nor is the situation mate-

---

[19] "The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement," *Steelworkers* v. *Warrior & Gulf Co.*, 363 U. S. 574, 581 (1960); hence the " 'common law of the shop.' " *Id.*, at 580, quoting Cox, Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482, 1499 (1959).

The remarks of Union Secretary-Treasurer Johnson in response to the suggestion that the Union abandon the grievance-arbitration avenue in favor of economic coercion are indicative. " 'I informed them,' " he testified, " 'what an individual wanted to do on their own, they could do, but I wasn't going to engage in any drama, but I wanted some orderly legal procedures that would have some long lasting effect.' " 192 N. L. R. B., at 182.

[20] The Company's Employer Information Report EEO-1 to the EEOC for the period during which this dispute arose indicates that it had employees in every minority group for which information was

rially different where, as apparently happened here, self-designated representatives purport to speak for all groups that might consider themselves to be victims of discrimination. Even if in actual bargaining the various groups did not perceive their interests as divergent and further subdivide themselves, the employer would be bound to bargain with them in a field largely pre-empted by the current collective-bargaining agreement with the elected bargaining representative. In this instance we do not know precisely what form the demands advanced by Hollins, Hawkins, et al. would take, but the nature of the grievance that motivated them indicates that the demands would have included the transfer of some minority employees to sales areas in which higher commissions were paid.[21] Yet the collective-bargaining agreement provided that no employee would be transferred from a higher-paying to a lower-paying classification except by consent or in the course of a layoff or reduction in force.[22] The potential for conflict between the minority and other employees in this situation is manifest. With each group able to enforce its conflicting demands—the incumbent employees by resort to contractual processes and the minority employees by economic coercion—the probability of strife and deadlock, is high; the likelihood of

required. Among sales workers alone it recorded male and female employees who were Negro, Oriental, and Spanish surnamed. App. 120. In addition, the Union took the position that older employees were also being discriminated against.

[21] At the Board hearing Hollins and Hawkins advanced as a basis for their belief that the Company was discriminating in assignments and promotions their own survey, Briefing on Conditions, Gen. Counsel Ex. 10, Court of Appeals App. 167. This document, reproduced in part in this Court, states: "We demand selling personnel of the following Racial groups to be infiltrated into the following high commission selling areas. Black, Mexicans, Chinese, Filipinos, etc." A number of such departments of the store are then listed. App. 118.

[22] § 20B (Seniority). Court of Appeals App. 205.

making headway against discriminatory practices would be minimal. See *Gateway Coal Co.* v. *Mine Workers,* 414 U. S. 368, 379 (1974).

What has been said here in evaluating respondent's claim that the policy against discrimination requires § 7 protection for concerted efforts at minority bargaining has obvious implications for the related claim that legitimate employer and union interests would not be unduly compromised thereby. The court below minimized the impact on the Union in this case by noting that it was not working at cross-purposes with the dissidents, and that indeed it could not do so consistent with its duty of fair representation and perhaps its obligations under Title VII. As to the Company, its obligations under Title VII are cited for the proposition that it could have no legitimate objection to bargaining with the dissidents in order to achieve full compliance with that law.

This argument confuses the employees' substantive right to be free of racial discrimination with the procedures available under the NLRA for securing these rights. Whether they are thought to depend upon Title VII or have an independent source in the NLRA,[23] they cannot be pursued at the expense of the orderly collective-bargaining process contemplated by the NLRA. The elimination of discrimination and its vestiges is an appropriate subject of bargaining, and an employer may have no objection to incorporating into a collective agreement the substance of his obligation not to discriminate in personnel decisions; the Company here has done as much, making any claimed dereliction a matter subject to the grievance-arbitration machinery as well as to the processes of Title VII. But that does not mean that an employer may not

[23] See *United Packinghouse Workers* v. *NLRB,* 135 U. S. App. D. C. 111, 416 F. 2d 1126, cert. denied, 396 U. S. 903 (1969); *Local Union No. 12, United Rubber Workers of America* v. *NLRB,* 368 F. 2d 12 (CA5 1966).

have strong and legitimate objections to bargaining on several fronts over the implementation of the right to be free of discrimination for some of the reasons set forth above. Similarly, while a union cannot lawfully bargain for the establishment or continuation of discriminatory practices, see *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192 (1944); 42 U. S. C. § 2000e–2 (c)(3), it has a legitimate interest in presenting a united front on this as on other issues and in not seeing its strength dissipated and its stature denigrated by subgroups within the unit separately pursuing what they see as separate interests. When union and employer are not responsive to their legal obligations, the bargain they have struck must yield *pro tanto* to the law, whether by means of conciliation through the offices of the EEOC, or by means of federal-court enforcement at the instance of either that agency or the party claiming to be aggrieved.

Accordingly, we think neither aspect of respondent's contention in support of a right to short-circuit orderly, established processes for eliminating discrimination in employment is well-founded. The policy of industrial self-determination as expressed in § 7 does not require fragmentation of the bargaining unit along racial or other lines in order to consist with the national labor policy against discrimination. And in the face of such fragmentation, whatever its effect on discriminatory practices, the bargaining process that the principle of exclusive representation is meant to lubricate could not endure unhampered.

### III

Even if the NLRA, when read in the context of the general policy against discrimination, does not sanction these employees' attempt to bargain with the Company, it is contended that it must do so if a specific element of that policy is to be preserved. The element in question

is the congressional policy of protecting from employer reprisal employee efforts to oppose unlawful discrimination, as expressed in § 704 (a) of Title VII. See n. 7, *supra*. Since the discharged employees here had, by their own lights, "opposed" discrimination, it is argued that their activities "fell plainly within the scope of," and their discharges therefore violated, § 704 (a).[24] The notion here is that if the discharges did not also violate § 8 (a)(1) of the NLRA, then the integrity of § 704 (a) will be seriously undermined. We cannot agree.

Even assuming that § 704 (a) protects employees' picketing and instituting a consumer boycott of their employer,[25] the same conduct is not necessarily entitled to

---

[24] This argument as advanced by respondent is somewhat weakened by its context of insistence that the discharged employees were not seeking to bargain with the Company. The same argument is made in the *amicus curiae* brief of the National Association for the Advancement of Colored People, pp. 9–14, on the assumption, however, that bargaining—over the issue of racial discrimination alone— was their objective. In light of our declination to upset the finding to that effect, we take the argument as the *amicus* makes it.

[25] The question of whether § 704 (a) is applicable to the facts of this case is not as free from doubt as the respondent and *amicus* would have it. In its brief the NLRB argues that § 704 (a) is directed at protecting access to the EEOC and federal courts. *Pettway* v. *American Cast Iron Pipe Co.*, 411 F. 2d 998 (CA5 1969). We have previously had occasion to note that "[n]othing in Title VII compels an employer to absolve and rehire one who has engaged in . . . deliberate, unlawful activity against it." *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 803 (1973). Whether the protection afforded by § 704 (a) extends only to the right of access or well beyond it, however, is not a question properly presented by these cases. Nor is it an appropriate question to be answered in the first instance by the NLRB. Questions arising under Title VII must be resolved by the means that Congress provided for that purpose.

In the course of arguing for affirmance of the decision below, under which the NLRB would be called upon to evaluate the effectiveness of a union's efforts to oppose employer discrimination in the bargaining unit, respondent takes the position that the Board

affirmative protection from the NLRA. Under the scheme of that Act, conduct which is not protected concerted activity may lawfully form the basis for the participants' discharge. That does not mean that the discharge is immune from attack on other statutory grounds in an appropriate case. If the discharges in these cases are violative of § 704 (a) of Title VII, the remedial provisions of that Title provide the means by which Hollins and Hawkins may recover their jobs with backpay. 42 U. S. C. § 2000e–5 (g) (1970 ed., Supp. III).

Respondent objects that reliance on the remedies provided by Title VII is inadequate effectively to secure the rights conferred by Title VII. There are indeed significant differences between proceedings initiated under Title VII and an unfair labor practice proceeding. Congress chose to encourage voluntary compliance with Title VII by emphasizing conciliatory procedures before federal coercive powers could be invoked. Even then it did not provide the EEOC with the power of direct enforcement, but made the federal courts available to the agency or individual to secure compliance with Title VII. See *Alexander* v. *Gardner-Denver Co.*, 415 U. S., at 44–45. By contrast, once the General Counsel of the NLRB decides to issue a complaint, vindication of the charging party's statutory rights becomes a public function discharged at public expense, and a favorable decision by the Board brings forth an administrative order. As

---

is well equipped by reason of experience and perspective to play a major role in the process of eliminating discrimination in employment. The Board-enforced duty of fair representation, it is noted, has already exposed it to the problems that inhere in detecting and deterring racial discrimination within unions. What is said above does not call into question either the capacity or the propriety of the Board's sensitivity to questions of discrimination. It pertains, rather, to the proper allocation of a particular function—adjudication of claimed violations of Title VII—that Congress has assigned elsewhere.

a result of these and other differences, we are told that relief is typically available to the party filing a charge with the NLRB in a significantly shorter time, and with less risk, than obtains for one filing a charge with the EEOC.

Whatever its factual merit, this argument is properly addressed to the Congress and not to this Court or the NLRB. In order to hold that employer conduct violates § 8 (a)(1) of the NLRA *because* it violates § 704 (a) of Title VII, we would have to override a host of consciously made decisions well within the exclusive competence of the Legislature.[26] This obviously, we cannot do.

*Reversed.*

MR. JUSTICE DOUGLAS, dissenting.

The Court's opinion makes these Union members— and others similarly situated—prisoners of the Union. The law, I think, was designed to prevent that tragic consequence. Hence, I dissent.

The employees involved, who are black and who were members of a Union through which they obtained employment by the Emporium, would seem to have suffered rank discrimination because of their race. They theoretically had a cause of action against their Union for breach of its duty of fair representation spelled out in *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192. But as the law on

---

[26] In *Alexander* v. *Gardner-Denver Co.,* 415 U. S., at 48 n. 9, we had occasion to refer to Senator Clark's interpretive memorandum stating that "[n]othing in Title VII or anywhere else in this bill affects rights and obligations under the NLRA . . . ." Since the Senator's remarks were directed to the suggestion that enactment of Title VII would somehow constrict an employee's access to redress under other statutory regimes, we do not take them as foreclosing the possibility that in some circumstances rights created by the NLRA and related laws affecting the employment relationship must be broadened to accommodate the policies of Title VII.

that phase of the problem has evolved it would seem that the burden on the employee is heavy. See *Vaca* v. *Sipes,* 386 U. S. 171, 190, where it was held that the union action must be "arbitrary, discriminatory, or in bad faith."

The employees might also have sought relief under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.,* which forbids discrimination in employment on the basis of "race, color, religion, sex or national origin." Section 704 (a) of that Act makes it unlawful for an employer to "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [the Act], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the Act]." In distinguishing "opposition" from participation in legal proceedings brought pursuant to the statute, it would seem that Congress brought employee self-help within the protection of § 704.*

In this case, the employees took neither of the foregoing courses, each fraught with obstacles, but picketed to protest Emporium's practices. I believe these were

---

*See CCH EEOC Decisions (1973) ¶ 6264 (Apr. 19, 1971). There the EEOC held that in spite of a collective agreement involving a "no strike" clause an employee might picket the plant for discrimination against blacks. The Commission said:

"An employee has a statutory right under Title VII to oppose, without retaliation, any unlawful employment practices of his employer. We believe this right cannot be abolished or diminished by a collective bargaining agreement. The protection which Title VII affords to Charging Party No. 1's conduct may be analogized to the protection the National Labor Relations Act affords employees who picket in protest against unfair labor practices committed by their employer, although there exists a valid collective bargaining agreement containing a no-strike clause."

The Commission rightly concluded that that decision was in line with *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270.

"concerted activities" protected under § 7 of the National Labor Relations Act. The employees were engaged in a traditional form of labor protest, directed at matters which are unquestionably a proper subject of employee concern. As long ago as *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U. S. 552, 561, we observed:

> "The desire for fair and equitable conditions of employment on the part of persons of any race, color, or persuasion, and the removal of discriminations against them by reason of their race or religious beliefs is quite as important to those concerned as fairness and equity in terms and conditions of employment can be to trade or craft unions or any form of labor organization or association."

These observations have added force today with the enactment of Title VII, which unequivocally makes the eradication of employment discrimination part of the federal labor policy, in light of which all labor laws must be construed.

The Board has held that the employees were unprotected because they sought to confront the employer outside the grievance process, which was under Union control. The Court upholds the Board, on the view that this result is commanded by the principle of "exclusive representation" embodied in § 9 of the NLRA. But in the area of racial discrimination the Union is hardly in a position to demand exclusive control, for the employee's right to nondiscriminatory treatment does not depend upon Union demand but is based on the law. We held in *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, that a union may not circumscribe an employee's opportunity to seek relief under Title VII. We said there that Title VII "concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congres-

sional command that each employee be free from discriminatory practices." *Id.*, at 51.

The law should facilitate the involvement of unions in the quest for racial equality in employment, but it should not make the individual a prisoner of the union. While employees may reasonably be required to approach the union first, as a kind of "exhaustion" requirement before resorting to economic protest, cf. *NLRB* v. *Tanner Motor Livery,* 419 F. 2d 216 (CA9), they should not be under continued inhibition when it becomes apparent that the union response is inadequate. The Court of Appeals held that the employees should be protected from discharge unless the Board found on remand that the Union had been prosecuting their complaints "to the *fullest extent possible, by the most expedient and efficacious means."* 158 U. S. App. D. C. 138, 152, 485 F. 2d 917, 931. I would not disturb this standard. Union conduct can be oppressive even if not made in bad faith. The inertia of weak-kneed, docile union leadership can be as devastating to the cause of racial equality as aggressive subversion. Continued submission by employees to such a regime should not be demanded.

I would affirm the judgment below.