NATIONAL LABOR RELATIONS
BOARD, Petitioner,

and

United Electrical, Radio & Machine
Workers of America (UE),
Intervenor,

v.

MASSACHUSETTS MACHINE AND
STAMPING, INC. (formerly Massachusetts Machine Shop, Inc.), Respondent.

No. 77–1450.

United States Court of Appeals,
First Circuit.

Heard March 7, 1978.

Decided June 28, 1978.

Bernard P. Jeweler, Atty., Washington, D.C., with whom Paul J. Spielberg, Deputy Asst. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., were on brief, for petitioner.

Allan A. Tepper, Boston, Mass., with whom Snyder, Tepper & Berlin, Boston, Mass., was on brief, for respondent.

Robert Z. Lewis, Frank J. Donner, and Leonard D. Polletta, New York City, on brief for intervenor, United Electrical, Radio and Machine Workers of America.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Massachusetts Machine and Stamping, Inc., seeks review and the National Labor Relations Board seeks enforcement of a Board order which, in a split decision, reversed the administrative law judge (ALJ) and found that the Company had violated section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5). The Board unanimously affirmed the ALJ's finding of a violation of section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), and ordered the Company to cease and desist from the alleged violations and to implement certain affirmative action. The Board's decision and order are reported at 231 N.L.R.B. 133.

*Background*

In June, 1973, the United Electrical, Radio and Machine Workers of America ("Union") was certified as the exclusive collective bargaining representative of the Company's production and maintenance employees and a collective bargaining agreement, to run for two years, was signed on November 2, 1973. The agreement provided that, should the Company move its operations to a new location within thirty miles of Roxbury, Massachusetts, the agreement would remain in force. In November, 1974, the Company notified the Union that it planned to move from its old and obsolete plant in Roxbury to an as-yet unspecified location. Preliminary discussions between the Company and Union were held during the next several months. In April, 1975, the Company indicated that the new plant site would be Nashua, New Hampshire, approximately forty miles away. Meetings were then held to discuss the effects of the move on employees, culminating in a "Memorandum of Agreement" dated June 23, 1975. The memorandum dealt with the closing of the Roxbury plant effective July 3, provided for severance pay to those employees who chose not to go to the Company's new facility and specified certain working conditions, including gas allowance for commuter-employees electing to remain with the Company. The memorandum included a sixty day "grace period," starting with the first day of work at the Nashua site of each employee, during which an employee who elected to transfer to Nashua had an option to be laid off with the same termination benefits and status as those choosing initially not to continue working with the Company.

Both the Company and the Union conducted independent polls and determined that only eleven of the twenty-two employees actually working in the Roxbury plant elected to work at the new site. In addition, all twenty-two employees who had been temporarily laid off, due to decreases in orders, opted in favor of accepting the severance pay in lieu of going with the Company to Nashua.

On July 21, the Company began operations at the new plant with only about one-half of the machinery and equipment in place. The rest was still in transit from Roxbury. On July 21, there were nineteen employees actually working, eleven from Roxbury and eight new hires. Three additional employees had been hired from the Nashua area, but had requested permission from the Company to start later; one of

the three started working on July 22 and the two others on July 28. On July 22, the Company hired four or more employees, two of whom started work on July 23, with the others starting on July 24 and 28. By July 28, the Company had fifteen employees from the Nashua area who had started working at the new plant. The eleven Roxbury transferees brought the work force to twenty-six. During the next month, several more employees were hired from the Nashua area.

*The § 8(a)(5) Violation*

It is an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees, . . ." 29 U.S.C. § 158(a)(5). The ALJ found that there had been no unfair labor practices prior to or with respect to the relocation itself. He further found that the Company did not have a duty to recognize the Union as the collective bargaining representative on July 21, since a good faith doubt existed as to the Union's majority status. He based this finding on several factors: (a) on July 21, although only nineteen employees were working, twenty-two had actually been hired (eleven from Roxbury and eleven from the Nashua area); (b) the employee complement was expected to increase shortly to as many as thirty-five employees; (c) by July 28, fifteen employees from the Nashua area were actually working, thus constituting a majority; (d) on July 21, only half of the equipment and machinery was in place and ready for operations.

The Board, reversing the ALJ in a split decision, rested its opinion on two grounds: (a) the doctrine of the presumption of continuing majority status, and (b) the fact that on the day operations began at the Nashua plant (July 21), a majority of the work force actually working consisted of Roxbury employees (eleven out of nineteen). The Board, in its brief urging us to enforce the order, also argues that its decision is buttressed by an "ancillary" presumption, *viz.* that new employees will support the union in the same proportions as the employees they replace.

During the first year following certification, the bargaining representative enjoys an "almost conclusive presumption" of continuing majority status. *N.L.R.B. v. Burns Security Services*, 406 U.S. 272, 279 n. 3, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). *But see N.L.R.B. v. Union Nacional de Trabajadores*, 540 F.2d 1, 13 & n. 11 (1st Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977). After this period, there is a rebuttable presumption of majority representation. *Celanese Corp. of America*, 95 N.L.R.B. 663, 672 (1951), cited with approval in *Burns, supra*, 406 U.S. at 279 n. 3, 92 S.Ct. 1571.

In our case, the refusal to bargain came more than one year after certification; the presumption of continuing majority status was, therefore, rebuttable. To overcome the presumption, the company can show either (1) lack of actual majority status or (2) a good faith doubt of majority status. *N.L.R.B. v. Vegas Vic, Inc.*, 546 F.2d 828, 829 (9th Cir. 1976), *cert. denied*, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1977). The good faith doubt must be reasonably grounded. *Terrell Machine Co. v. N.L.R.B.*, 427 F.2d 1088, 1091 (4th Cir.), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970). When several factors coalesce to create the good faith doubt, an assessment of the cumulative effect of those factors is made. *Royal Typewriter Co. v. N.L.R.B.*, 533 F.2d 1030, 1036 (8th Cir. 1976).

With these standards in mind, we conclude that the Company made the appropriate showing to sustain a good faith doubt as to the continuing majority status of the Union. The salient factors are: only eleven of the twenty-two active and forty-four total employees opted to go with the Company to Nashua; the Company moved to a new state, with an entirely different labor pool; the plant was not operating at full capacity on the day it first opened, thus justifying the Company in not considering July 21 as the "critical date" for determining majority status; the Company had a

reasonable expectation that the number of employees would increase within a very short period of time; on the day operations began the Company had hired twenty-two employees, only eleven of whom were carry-overs from Roxbury. This combination of factors adequately supports a finding of good faith doubt in continued majority status. We, therefore, hold that the Company rebutted the presumption and the burden shifted to the Board to prove that the Union represented a majority. *Dalewood Rehabilitation Hospital, Inc. v. N.L. R.B.*, 566 F.2d 77, 80 (9th Cir. 1977). We find that the record, taken as a whole, *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), including the administrative law judge's report, *id.* at 493, 71 S.Ct. 456, does not provide substantial evidence that the Union, in fact, constituted a majority. The finding by the ALJ that July 21 should not be the "critical date" should have been upheld by the Board. Its decision that there is no need to look beyond the July 21 date is clearly erroneous. One-half of the machinery and equipment was still in transit on July 21, and many more employees were expected to be hired to operate the machinery still en route. To make July 21 the cutoff date is to ignore the fact that the Company was not operating at normal capacity. We cannot say that operations on that date sufficiently reflected the ordinary business of the Company.

▉▉▉▉ The Board's approach is unnecessarily rigid and mechanistic. While the first day of operations may normally be the appropriate date on which to determine majority status, the circumstances attending the instant case indicate valid reasons for not doing so. It must be remembered that designation of a union as the exclusive bargaining representative necessarily impinges on individual rights. *See Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 17 L.Ed.2d 842

(1967); *J. I. Case Co. v. N.L.R.B.*, 321 U.S. 332, 338–339, 64 S.Ct. 576, 88 L.Ed. 762 (1944). Once a union has been selected as the section 9(a), 29 U.S.C. § 159(a), representative, it is the exclusive representative for *all* the employees in the unit. Even employees who are not members of the union are foreclosed from dealing directly with the employer. If a minority of the employees attempt to exercise their section 7[1] rights without authorization by the union, their activities will be unprotected and, hence, they will be subject to dismissal or disciplinary action. *See e. g., Emporium Capwell Co. v. Community Org.*, 420 U.S. 50, 61 n. 12, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975); *N.L.R.B. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967).

Before the individual worker surrenders these rights to a union, it should be clearly ascertained that the union, in fact, represents a majority of the employees. In the case before us, only 25% of the Company's employees chose to retain their status as employees (only 50% of those working at the time of the move); all the Roxbury employees had the option of discontinuing work in favor of the severance payments within the first sixty days at Nashua (one employee did so); as of July 28, one week after the Company began operations at Nashua, there was a substantial majority of the work force which had never chosen to have the Union—or indeed any union—represent them. The approach taken by the ALJ and the dissenting member of the Board properly acknowledges the right these employees have in bargaining about their own working conditions and in selecting *vel non*, a union to represent them. 29 U.S.C. § 157.

▉▉▉▉ The Board's "ancillary" presumption, that new employees will support the union in the same ratio as the employees

---

1. The statute, in pertinent part, reads as follows:

   *§ 157. Rights of employees*
   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities . . . . . .

they replace, is not apposite in the case before us. That principle was enunciated in the context of typical turnover of employees. *See e. g., N.L.R.B. v. King Radio Corp.*, 510 F.2d 1154 (10th Cir.), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975). A substantial change in geographic location, where no unfair labor practices are implicated in the move itself, and where circumstances suggest the absence of a continuing majority, does not warrant the invocation of presumed continuing majority status, nor the so-called ancillary presumption that new employees in the new setting will support the union in the same ratio as employees at the former site. *See e. g., International Union, United A., A., & A. Imp. Wkrs. v. N.L.R.B.*, 129 U.S.App.D.C. 282, 287, 394 F.2d 757, 762 *cert. denied*, 393 U.S. 831, 89 S.Ct. 100, 21 L.Ed.2d 102 (1968); *Cooper Thermometer Co. v. N.L.R.B.*, 376 F.2d 684, 689–690 (2d Cir. 1967). There is no issue here of improper motive in seeking the move, nor of any unfair labor practice associated with the move itself. The move to a location forty miles away in a different state, under these circumstances, is a compelling reason for giving the new workers hired there the right to bargain for their own conditions of employment and choose their own bargaining representative. *Compare N.L.R.B. v. Die Supply Corp.*, 393 F.2d 462 (1st Cir. 1968).

*The § 8(a)(1) Violation*

■ The Company argues, in seeking review of both the ALJ and Board finding of a section 8(a)(1) violation, that an adverse inference should have been drawn from the failure of the Board to call a certain witness, available to both the Board and the Company, who purportedly could have contradicted the testimony of the major complaining witness, Brown. The section 8(a)(1) unfair labor practices occurred in January and March, 1976, when the Company allegedly threatened discharge and plant closure in reprisal for union activity. The ALJ, in discharging his duties, assessed the credibility of the witnesses and chose to believe the witness for the Union. There is substantial evidence in the record to sup-

port his finding, including discrepancies between prehearing affidavit testimony and testimony given at the hearing by a Company witness. In the matter of credibility of witnesses, the fact finder will be reversed only in exceptional cases. *N.L.R.B. v. Security National Life Insurance Co.*, 494 F.2d 336, 337 (1st Cir. 1974). *Cf. Stone & Webster Engineering Corp. v. N.L.R.B.*, 536 F.2d 461, 465 (1st Cir. 1976).

At oral argument, the Company suggested that *International Union (UAW) v. N.L.R.B.*, 148 U.S.App.D.C. 305, 459 F.2d 1329 (1972), supported the Company's contention that an adverse inference should have been drawn from the Board's failure to call Taylor, the witness who purportedly would have undercut the testimony of witness Brown. That case does not aid the Company. There, the failure of the intransigent company to provide subpoenaed records, solely within its dominion, which could have shown whether discharges were made for proper or improper reasons, led the court to draw an adverse inference from the failure to produce the requested documents. *Id.* 148 U.S.App.D.C. at 310–315, 459 F.2d at 1334–1339. Here, there is no suggestion that the witness was peculiarly within the control of either the Union or the Board. The witness was available to any party desiring to call him. In fact, if we were to adopt the Company's reasoning, it would be as logical to draw an inference adverse to the Company for its failure to call the missing witness as to invoke the inference against the Board.

*The order is vacated as to the section 8(a)(5) violation and enforced as to the section 8(a)(1) violation.*