## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## ARCHITECTURAL RESEARCH CORPORATION, Respondent.

### Nos. 83–5853, 83–5857.

United States Court of Appeals,
Sixth Circuit.

Submitted Oct. 2, 1984.

Decided Nov. 27, 1984.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Elliott C. Winograd, New York City, Karl R. Lukens, Livonia, Mich., for respondent.

Before KRUPANSKY and WELLFORD, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

The instant appeal presents an application for enforcement of a National Labor Relations Board (NLRB) order requiring the respondent, Architectural Research Corporation (the Company) to reinstate two former employees who were discharged for "walking off the line." The petition resulted from the circumstances set forth below.

The Company manufactured resinous floor block and related products at its Livonia, Michigan facility. At all relevant times, Engineer David Flodquist was in charge of production, and Mathew Ferrari was a supervisor under Flodquist. Company production and maintenance employees were represented by Local Union No. 247 (the Union), a Teamsters' affiliate, and thus their working conditions were governed by a collective bargaining agreement. The union steward was Tony Paglione.

Under the collective bargaining agreement, employees were entitled to two work breaks during the day shift: one in the morning and one in the afternoon. Due to its precarious financial position in the fall of 1980, the Company proposed altering the contract, *inter alia*, by eliminating the afternoon work break to increase production. On October 6, 1980, the Union members unanimously affirmed the Company's proposed amendments. Phillip Searls, one of the discharged employees and a petitioner herein, was among the union members who

**1122**

approved the change. The other terminated employee, Gregory Sitarski, was not a union member and was thus ineligible to vote. However, Sitarski was subject to the same rights and rules under the collective bargaining agreement as were members of the union.

By January and February of 1981, installation of new equipment increased productivity. Company officials were contemplating the renegotiation of the employee concessions made in 1980, and directed plant engineer Flodquist to initiate discussions with Union shop steward Paglione about restoring the afternoon work break.

On March 25, 1981, Searls and Sitarski were called back to work from a layoff period which had commenced in early December, 1980. On the first day back to work, employees Searls and Sitarski discussed the afternoon break, and Searls explained to Sitarski that Union members had agreed to eliminate that work break. The two resolved to discuss the issue with Company and Union officials.

The following day, Searls and Sitarski inquired of Union steward Paglione about the afternoon work break. Paglione instructed Searls that if he had an objection to the one work break per day schedule, Searls should file a written grievance with the Union in accordance with the collective bargaining agreement. Non-union member Sitarski was fully informed of the Union-approved concessions, including the reduction of the daily work breaks, by Paglione.

At the conclusion of the work day on March 30, 1981, the issue of the afternoon work break again surfaced when Searls and Sitarski made inquiries of Flodquist about the afternoon work break. Flodquist advised the employees, who apparently questioned the validity of the 1980 concessions, that the subject was a matter for discussion between the Union and the Company and referred the employees back to Union steward Paglione.

At 10 a.m. the following day, Searls again asked Union steward Paglione how he could obtain an afternoon work break without going through the grievance procedure. Paglione responded that the grievance procedure was the only proper avenue of protest. Later Searls encountered Flodquist in the work area and again undertook discussion about the afternoon work break. Flodquist reiterated his former statements by responding that the matter "was something that would have to be discussed". Subsequently, Searls and Sitarski conversed between themselves as to the need for an afternoon work break and resolved to talk to shift leader Ferrari about it.

At 2:30 p.m. on March 31, 1981, Searls and Sitarski were performing their usual work on the production line when Ferrari stopped a fork lift about five yards from Searls' work station and seven or eight feet from Sitarski's work area. The two employees turned to Ferrari, and advised him that production was high and that they would like to take a work break, and asked if they could speak to him or Flodquist about it. Ferrari replied that he wasn't authorized to allow employees to take work breaks and that Searls and Sitarski would have to speak with Flodquist about it. Searls and Sitarski immediately left their work stations and proceeded to the lunch room and Ferrari went to Flodquist's office.

Flodquist arrived at the lunch room about 2 or 3 minutes after Searls and Sitarski had arrived and asked the employees about the nature of their problem. Searls and Sitarski again pressed Flodquist to authorize a work break. According to the credited testimony of the employees, Flodquist responded: "Okay. To start with, you're going to be discharged. I'm going to enter into your records that you walked off the line. If you guys would have waited 3 or 4 weeks, this would have all been resolved anyways." Flodquist advised both employees that they "were just causing too many problems within the past week inquiring about breaks..."

Flodquist fired Searls and Sitarski for walking off the line and insubordination.

Searls and Sitarski filed charges with the NLRB, claiming that their discharge consti-

tuted a violation of § 8(a)(1) of the National Relations Labor Act. Specifically, petitioners alleged that their actions in leaving their work stations was protected activity within the meaning of federal labor law.

The case was heard by an a.l.j. on June 24 and 25, 1982. On December 6, 1982, the a.l.j. issued a decision in which he determined that the employee actions were protected union activities. The a.l.j. ordered that the Company cease and desist from interfering with such acts and further required the Company to reinstate the employees with back pay and full seniority rights.

The order was appealed to a three-member panel of the NLRB, which affirmed the a.l.j.'s order by a two-to-one vote. Panel Chairman Donald L. Dotson dissented on the grounds that "Searls and Sitarski were not entitled to the protection of the Act because they were not seeking to present a grievance to Respondent [Company] but were in fact attempting to bargain with the latter in derogation of the Union's status as the exclusive bargaining agent of the employees."

The resolution of the case at bar turns on the characterization of the activity of Searls and Sitarski. If their activity can be correctly described as an attempt to present a grievance, then it is, as the NLRB claims, a protected activity. On the other hand, if their activity was an effort by the employees to bargain directly with the Company, then it is not protected activity, but rather an attempt to supplant the Union as the exclusive bargaining representative of the employees in contravention of the Supreme Court's clear mandate in *Emporium Capwell Co. v. Western Addition Community Organization, et al.*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975).

The Company and the NLRB devoted much of their arguments on appeal to the accuracy of the credibility assessments contained in the a.l.j.'s opinion. However, the petition for enforcement can be decided solely on the basis of the testimony credited by the a.l.j., i.e., the non-disputed testimony.

First, according to the credited testimony of Sitarski and Paglione, both Sitarski and Searls had been instructed by Union steward Paglione on March 26, 1981, that they were *not* entitled to a second work break because employees including Searls had voted to accept its elimination to aid the Company. Paglione also told Searls that if he was dissatisfied with the arrangement, his proper recourse was to file a grievance with the Union, which Searls never did.

Secondly, the credited testimony of plant engineer Flodquist disclosed that Searls had sought him out after work on March 30, 1981, about the second work break, and that Flodquist responded that such a change in the amended collective bargaining agreement would have to be negotiated with the Union. The following morning, Flodquist approached Union steward Paglione and suggested that restoration of the afternoon work break might be an appropriate subject for future negotiations. The same morning, Searls again confronted Flodquist on this subject and the latter replied that it "would have to be discussed."

That afternoon at 2:30, the time of their pre-existing work break, Searls and Sitarski stopped work and requested their immediate supervisor, Ferrari, to take a work break. Ferrari thereupon referred the matter to Flodquist who discharged them when Searls reiterated their demand for an immediate resumption of the afternoon work break. The NLRB's dissenting member, Chairman Dotson, accurately summarized the above evidence when he wrote:

> What occurred here was that these two employees took matters into their own hands by directly approaching respondent after they were told by the union steward that ... their only recourse was to file a grievance with the Union. The dissatisfaction of the two employees with what they may have regarded as the Union's unresponsiveness cannot justify or legitimize their circumvention of the Union as the exclusive bargaining agent.

In sum, then, despite repeated admonitions from Union and Company officials that the afternoon work break was the proper subject for Union-Company negotiations, employees Sitarski and Searls stopped working on the afternoon of March 31 and again confronted company officials about the break. The employees' subsequent discussions with Flodquist further evinced their intent to bypass the Union and deal directly with the Company in blatant contravention of the Union's status as the employees' exclusive bargaining representative. Such action is not protected activity within the context of federal labor law. *Emporium Capwell Co., supra.*

In addition, the cases relied upon by the NLRB to support enforcement of the instant order are clearly inapposite to the case at bar. In *NLRB v. Brown*, 546 F.2d 690 (6th Cir.1976) (per curiam), this court upheld the Board's finding of a § 8(a)(1) violation where an employee was terminated for speaking to a supervisor concerning wages *and* for circulating literature including union authorization cards. In *NLRB v. Elias Brothers Restaurants, Inc.*, 496 F.2d 1165 (6th Cir.1974) (per curiam), the court affirmed the Board's decision that respondent was improperly fired for complaining about working conditions (i.e. broken air conditioning and wet floors) and attempting to organize an employee walkout. The panel in *NLRB v. Evans Packing Co.*, 463 F.2d 193 (6th Cir.1972) held that an employee's inquiries to two supervisors of a non-union shop regarding overtime pay constituted protected concerted activities when viewed in light of the company's history of opposition to unionization and evidence that supervisors had previously chastized the terminated employee for "talking union". Similarly, in *NLRB v. Halsey W. Taylor Co.*, 342 F.2d 406 (6th Cir.1965) (per curiam), the court held that discharged worker's oral protests to foreman for the purpose of securing more overtime for the employees was protected activity where the employee had been a vocal advocate of unionization several months prior to termination.

Thus, in each case cited by the Board, the "protected" activity in which the discharged employee had engaged was either related to an effort to unionize or, as in the *Elias Brothers* case, an effort to organize a walkout to protest unhealthy working conditions. The mere verbalization of the employee's grievance was not, as the Board contended in the instant case, the "protected activity" in these decisions.

Based upon a thorough review of the entire record, substantial evidence does not support the Board's conclusion that the actions of Searls and Sitarski constituted protected activity. Therefore, the petition for enforcement is denied.