Diane EGGER, Plaintiff,

v.

**LOCAL 276, PLUMBERS AND PIPEFITTERS UNION, AFL–CIO and Max Fish Plumbing and Heating Co., Inc., Defendants.**

**Civ. A. No. 85–1965–C.**

United States District Court,
D. Massachusetts.

Sept. 23, 1986.

George C. Deptulas, Berlin, Clarey & Green, Boston, Mass., for plaintiff.

Thomas F. Birmingham, Flamm and Birmingham, Boston, Mass., for Local 276.

Girard R. Visconti and Thomas W. Heald, Visconti & Heald Ltd., Providence, R.I., for Max Fish Plumbing & Heating Co., Inc.

## MEMORANDUM

CAFFREY, Chief Judge.

This is a civil action brought by the plaintiff, Diane Egger, against the defendants, Local 276, Plumbers and Pipefitters Union, AFL–CIO ("Local 276" or "the union") and Max Fish Plumbing and Heating Co., Inc. ("Max Fish"). In counts one and two, the plaintiff alleges that the defendants engaged in unlawful practices which denied her equal opportunity for employment because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Counts three and four allege that the defendants con-

spired to deprive the plaintiff of her civil right to be free from discrimination because of her sex in violation of Title VII and 42 U.S.C. § 1985(3). The remaining five counts are based on Massachusetts state law. Counts five and six allege that the defendants interfered with the plaintiff's exercise of her civil rights in violation of Chapter 12, §§ 11H and I of the Massachusetts General Laws, count seven alleges a claim against Local 276 for intentional infliction of emotional distress and counts eight and nine allege wrongful discharge by both defendants. The matter is now before this Court on the defendant Local 276's motion to dismiss or, in the alternative, for summary judgment and the defendant Max Fish's motion for summary judgment.

To prevail on a motion for summary judgment, the moving party must show that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *E.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The evidence must be viewed in the light most favorable to the party opposing the motion. *Id.*

The plaintiff, Diane Egger, is a journeyman plumber presently employed by a nonunion plumbing firm owned by her father. She began her career as a plumber in 1978 when she joined Local 276. From June 1978 to May 1981, Egger worked as an apprentice plumber at Babbit and Simmons, Inc., a union company owned at that time by her father. During those years, she attended plumbing classes at Southeastern Vocational School and Old Colony Trade School, and a welding class run by Local 276.

In May of 1981, Egger, in search of experience with companies other than her father's, requested a job referral from Local 276. This request was made to Francis McKeown, who, as the business manager of Local 276, was responsible for assigning available jobs to members who placed their name on the out-of-work list. The list operates so that the member who has been unemployed the longest receives the first incoming job for which he or she is qualified. Within several days, McKeown referred Egger to a job at Barrett Associates, where she worked from May to August of 1981, when the job was completed. In July of 1981, Egger received her license as a journeyman plumber from the Massachusetts Board of State Examiners of Plumbers. When the job with Barrett ended, Egger called McKeown and asked him to put her name on the out-of-work list again. She phoned him several times thereafter until McKeown told her it was not necessary to call in and that he would call her when he had a job referral for her.

Toward the end of September 1981, Egger was referred to Balco, Inc. at Brockton Hospital to work as a pipefitter.[1] After several months of working for Balco, Egger asked McKeown to transfer her to another job because of the physical abuse and sexual harassment she encountered at that location and because the work assigned to her was far below her skill level. The plaintiff allegedly told McKeown that the steward for Local 276 endangered her safety by pulling a ladder out from under her and shoving a heavy steel pipe into her ribs, and also made unfounded complaints to the foreman[2] about her preparedness for work. According to Egger, the steward, foreman, and several other male workers made her so uncomfortable by telling "dirty jokes" and making sex-related remarks[3] that she stayed outside in freezing

---

1. Local 276 represents both plumbers and pipefitters. Pipefitting apparently requires less skills than plumbing and requires different training. Egger was the only member of Local 276 with a plumber's license who worked as a pipefitter at the Balco job.

2. The foreman on a job is designated by the employer and is the employer's representative and agent. It is the foreman's job to assign work to employees.

3. According to Egger, the men made comments on her chest size, asked about and made remarks about her sex life, talked about their own sex lives, showed her "dirty books," and asked her to participate in a sexually explicit home video.

weather rather than join the rest of the crew in the on-site trailer. When Egger went to get coffee from the canteen truck at break time, male workers, at least one of whom was a member of Local 276, grabbed at her body. Egger complained about the treatment she received at Balco to the union steward and McKeown. In response, she was told to learn to "take it like a man" and to psychologically become a man. Although McKeown contends that Egger did not complain to him about the work environment at Balco, it is undisputed that Egger told him she was being assigned low-level, demeaning work and that McKeown transferred Egger to another job, at Thomas Olean and Son, Inc.

Egger worked for Thomas Olean for two or three weeks. While she was there, the foreman, who was not a member of Local 276, allegedly locked her in a room with him and demanded sexual favors in return for keeping her on the job. Egger refused, but did not report the incident to Local 276 because she did not want to be branded a complainer. Later, the foreman criticized Egger's work and threatened to report her to the union. Egger states that the foreman told her that he was annoyed that the union had sent him a woman and did not want to pay a woman a plumber's union wage. Egger was laid off from the job on the basis that there was no more work.

A few weeks later, Egger was referred by Local 276 to work at Frank Sullivan Co., Inc. The foreman on the job, who was not a member of Local 276, allegedly told Egger that he was displeased that the union had sent him a woman. A few days later, the foreman hired an additional plumber, an older man referred to as "the Frenchman." The Frenchman acted as the union steward for the job. It is unclear whether he was a member of Local 276. According to Egger, the Frenchman was drunk all the time, constantly told dirty jokes, and tried to get her into his van. After about a week, the foreman discharged Egger and retained the Frenchman. Although McKeown had told Egger the job would last about a year, the foreman told her she was being let go for lack of work. According to Egger, the foreman also stated that he did not want to pay a woman "that amount of money." The Frenchman stated that he would not want to pay her that much either. Egger did not report the foreman's or the steward's comments to Local 276.

About two weeks later, Egger was referred to still another job, this one with Davis Plumbing and Heating, Inc. Egger states that male co-workers on that job bothered her with dirty jokes, remarks about her body, and questions about her sex life. Some of her co-workers also put cockroaches in her hair and pants, and sent her into a cellar to find a decapitated cat. Egger was laid off from the job after only three weeks allegedly for lack of work. McKeown had told Egger the job would last at least seven months. According to Egger, on the day she was discharged, the owner came to the job site, saw her, and stated, in effect, that he did not want to pay a female to do plumbing work and that the men would not work as hard with a woman around. Egger called McKeown and told him what had happened. McKeown put Egger on the out-of-work list.

Egger received no further job referrals from Local 276 for about a year. During the first five months following the Davis job, Egger estimated jobs for her father for no pay. In August of 1982, McKeown telephoned Egger, told her that he would not be able to get her a job for awhile, and suggested that she take a course in solar technology, which Local 276 would pay for, at Massasoit Community College. McKeown also apparently told Egger that there was work at Seabrook Nuclear Power Station but advised Egger not to go to Seabrook because of the "tough" environment for female workers there. Egger took McKeown's advice and attended the course at Massasoit.

After several months at Massasoit, Egger realized that the course, entitled "Energy Technology," had little to do with solar energy and its relation to plumbing. She

therefore quit the program and called McKeown to have her name put on the out-of-work list. While waiting for a job referral from Local 276, Egger worked for her father. After several months of no contact from Local 276 and after learning that members of Local 276, who she believed had not been on the out-of-work list as long as she had, had received jobs, Egger called McKeown to complain. She was then referred to a job with Max Fish Plumbing and Heating Co. at Brockton Hospital.

At Max Fish, the foreman on the job, who was not a member of Local 276, gave Egger apprentice level work to do. Egger complained to the union steward about the level of work assigned to her. Although McKeown had told Egger that the Max Fish job would last about a year, Egger was let go after a week. According to Max Fish, Egger was discharged because of lack of work. Before Egger was let go, the foreman for Max Fish allegedly told Egger that when she first arrived at the job site, he had been upset to see that Local 276 had sent a woman.

On the same day she was discharged from Max Fish in mid-May of 1983, Egger called Local 276 to report the lay-off. McKeown told her that she would be put back on top of the out-of-work list. It was union policy that anyone who accepted a job which lasted less than 15 days regained his or her priority position on the list. Although Egger was therefore supposedly at the top of the out-of-work list, she was not referred to Max Fish when, about three weeks later, the company requested plumbers from Local 276.

A short time later, Egger began working for her father again. Later, during a conversation with McKeown in August of 1983, Egger learned that her name had not been put on the out-of-work list following her lay-off from Max Fish. About that time, her father decided that his company would "go non-union," and Egger decided to leave the union and go with him. Egger never formally resigned from the union, however. She was then at least six months behind in her dues payments. Egger was expelled from the union in November 1983 for non-payment of dues.

In addition to the discrimination that Egger alleges she endured with regard to job referrals from the union and to sexual harassment on the job sites, Egger also claims sexual harassment during apprentice training classes. According to Egger, a teacher, who was then the president of Local 276, constantly told dirty jokes, asked her to "sit on my face," asked questions about the tampax in the ladies' room, and at one point, demanded sexual favors from her. Egger also contends that members made so many comments about her as a female during union meetings that she ceased attending them.

In November of 1983, Egger filed charges of employment discrimination against Local 276 and Max Fish with the Equal Employment Opportunity Commission ("the EEOC"). Upon request of the plaintiff, the EEOC issued notices of right to sue the defendants on February 26, 1985. The plaintiff then commenced this action.

In count one, the plaintiff alleges that Local 276 violated Title VII by discriminating against her because she was a female. The plaintiff contends that Local 276 gave preferential treatment to male members in job referrals, allowed her to suffer from sexual harassment, allowed Max Fish to lay her off on the basis of no work and hire male union members instead, assigned her to menial and demeaning duties when she was on a job, failed to give her adequate notice of employment opportunities, and constructively discharged her from the union. In a Title VII case, the plaintiff first has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The initial burden of establishing a prima facie case in employment discrimination suits is not onerous. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207

(1981). The plaintiff need only prove that she was qualified for an available job and was rejected under circumstances which give rise to an inference of unlawful discrimination. *Id.* Once the plaintiff establishes a presumption of unlawful discrimination in employment, the burden shifts to the defendant to produce sufficient admissible evidence to warrant a judgment that the plaintiff was rejected, or someone else was preferred, for a legitimate nondiscriminatory reason. *Id.* at 254–55, 101 S.Ct. at 1094–95. The defendant need not prove that his actions were in fact motivated by the legitimate reason and not by a discriminatory one. *Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 70 (1st Cir.), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984). The defendant's burden is met if the evidence he presents raises a genuine issue of fact about whether he discriminated against the plaintiff. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. If the defendant successfully satisfies his burden of proof, the plaintiff then has the opportunity to persuade the court that a discriminatory reason more likely than not motivated the defendant or that the defendant's explanation is not believable. *Id.* at 256, 101 S.Ct. at 1095.

Under Title VII, a labor organization may not fail to refer an individual for employment because of her sex. 42 U.S.C. § 2000e–2(c)(2). Egger avers in her affidavit and deposition that in 1983 Local 276 twice bypassed her name and referred male members who were below her on the out-of-work list to jobs for which she was qualified. The first alleged instance of discrimination was when Egger requested that her name be put on the list after leaving Massasoit Community College in January of 1983. Egger received no referrals until she complained to McKeown that union members below her on the list were being referred to jobs. She was then referred to the Max Fish job in May of 1983. The second instance occurred after Egger was laid off from Max Fish. Egger telephoned McKeown and was told that her name would be put back on top of the out-of-work list. Yet she was not referred to Max Fish when Max Fish again called Local 276 seeking plumbers a few weeks later; other members of the union were sent to the job instead. These facts constitute prima facie evidence of discrimination.

■ In response to Egger's allegations concerning job referrals, Local 276 first contends that since plaintiff's claims pursuant to Title VII can relate back only 180 days from the filing of her charge with the EEOC, 42 U.S.C. § 2000e–5(e), its liability is limited to acts which occurred on or after May 12, 1983. The plaintiff argues that the "continuing violations" theory applies to her allegations. Under this theory, where there is evidence that the alleged violations are ongoing in nature, a charge of discrimination filed with the EEOC may be timely filed as to all acts encompassed by the discriminatory policy so long as the charge is filed within the statutory period following a discriminatory act which is part of the alleged pattern of discrimination. *Velazquez v. Chardon,* 736 F.2d 831, 833 (1st Cir.1984). For the continuing violations theory to apply, it is not enough that the plaintiff continues to suffer from some act which occurred prior to the statutory cut-off date. *Id.* There must be a present discriminatory act falling within the statutory period which by itself constitutes a separate civil rights violation. *Id.* In this case, Egger alleges that Local 276 discriminated against her with regard to job referrals following her termination from Max Fish because she is a female. It is undisputed that this charge was timely filed. Egger also alleges that Local 276 discriminated against her with regard to job referrals between January and May of 1983, a time span which falls outside the 180 day period.

The union's alleged practice of referring male members of Local 276 who were below Egger on the out-of-work list to jobs for which she was qualified during these two time periods does not represent two distinct discriminatory acts. Rather, it represents an ongoing discriminatory policy consisting of a series of separate acts. Ac-

cordingly, I rule that Egger's claim concerning job referrals between January and May of 1983 is timely because it alleges acts within a pattern and policy of discrimination which constitutes a continuous violation.

▮ To rebut the merits of Egger's claim, Local 276 points to a record it compiled which lists the number of hours members of Local 276 worked within its jurisdiction. According to Local 276 the record shows that the total number of hours Egger worked as a union member from July 1978 through May 1983 compared favorably to the number of hours worked by other members with comparable skills. The record presumably includes all the hours that Egger worked for her father as a union plumber since it includes the years June 1978 through May 1981 when Egger worked exclusively for her father's union company as an apprentice. Because the record does not include the hours members spent working in other union jurisdictions, the figures do not give an accurate picture of who was out of work during a specific time and for how long. With regard to Egger, the record states that she worked only 64 hours on union jobs between July of 1982 and May of 1983. The union contends that it did not refer jobs to Egger in 1983 because it knew she was working for her father. The union does not assert that it thought Egger was working as a plumber for her father's union company for non-union wages. There is no question that plumbers work at other jobs while waiting for job referrals from Local 276. Union rules permit plumbers to work other jobs so long as they do not "use their tools." Such other work does not make a union member ineligible for the out-of-work list. Indeed, according to McKeown, members working as plumbers for union wages in other jurisdictions maintain their place on

Local 276's out-of-work list. It seems disingenuous, therefore, for Local 276 to assert that no jobs were referred to Egger because it knew she was working for her father when its records show that any work she had was not as a union plumber. Moreover, following her lay-off from Max Fish, Egger was not referred to Max Fish again even though Max Fish requested union plumbers and had no right, according to union rules, to designate whom it wanted. McKeown asserts that he never intentionally left Egger off the list. It is difficult, however, to believe she was accidentally left off the list two times in a row. Whether Egger was qualified for the employment opportunities other than the Max Fish job which came into Local 276 is unclear. She worked as a pipefitter on at least one previous assignment, at Balco, and possibly could have been referred to a pipefitter job in 1983. Based on the foregoing discussion, I rule that there is a genuine issue of fact as to whether Local 276 discriminated against Egger in its job referral practices and summary judgment should be denied on this issue.

Egger also contends in count one that Local 276 violated Title VII by acquiescing in or allowing its members and the employers with whom it dealt to sexually harass her and thereby create a hostile working environment. Under Title VII, it is "an unlawful employment practice for a labor organization ... to discriminate against, any individual because of ... sex." 42 U.S.C. § 2000e–2(c)(1). Sexual harassment is a form of discrimination prohibited by Title VII and a claim of hostile environment sex discrimination is actionable under Title VII. *Meritor Savings Bank v. Vinson,* —— U.S. ——, ——, ——, 106 S.Ct. 2399, 2403, 2409, 91 L.Ed.2d 49 (1986). Under the guidelines promulgated by the EEOC,[4] "unwelcome sexual advances, requests for sexual favors, and other verbal

---

**4.** Guidelines interpreting a legislative act which have been promulgated by the agency designated by Congress to enforce the Act are not binding on courts. *E.g., Meritor Savings Bank v. Vinson,* —— U.S. ——, ——, 106 S.Ct. 2399, 2403, 91 L.Ed.2d 49 (1986). These guidelines, however, constitute a body of experience and judg-

ment which courts may properly resort to for guidance. *Id.* The guidelines in 29 C.F.R. § 1604 on discrimination because of sex apply to labor organizations insofar as their action or inaction affects employment opportunities. 29 C.F.R. § 1604.1(a) (1985).

or physical conduct of a sexual nature constitute sexual harassment when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a) (1985). Although a labor organization is not automatically liable for sexual harassment by its members, absence of notice to the union of discriminatory misconduct does not insulate it from liability. *Meritor Savings Bank v. Vinson,* —— U.S. at ——, 106 S.Ct. at 2407. Common law principles of agency provide guidance on this matter. *Id. See generally Restatement (Second) of Agency* §§ 219–37 (1958). It is clear that Local 276 had no agency relationship with co-workers who were not members of Local 276 and therefore cannot be liable for their actions. The relationship between the steward and the union is less clear. Although the union asserts that a steward "basically serves as a dues collector," the record shows that the steward was also the person designated by the union to receive complaints about working conditions from union members on a job site. Whether or not the steward acted as an agent of Local 276 cannot be determined on the basis of the record now before the Court.

■ Under Title VII, a labor organization has an affirmative duty to alleviate sex discrimination in employment. *Chrapliwy v. Uniroyal, Inc.,* 458 F.Supp. 252, 283 (N.D.Ind.1977). *See also,* 29 C.F.R. § 1604.11(f) (1985).[5] A union therefore violates Title VII if it acquiesces in an employer's discriminatory policies and procedures. There is a genuine issue of fact concerning

why Egger was discharged from Max Fish, and why she was not subsequently referred back to Max Fish by Local 276. I therefore rule that summary judgment should be denied with regard to allegations that Local 276 allowed or acquiesced in the sexual harassment of Egger in the workplace and acquiesced in Max Fish's alleged discriminatory firing of and failure to re-hire Egger because of her sex.

■ Turning to the remaining allegations in count one, I rule first that Egger has not established a prima facie case of discrimination with regard to job assignments and sufficiency of notice concerning job opportunities. It is undisputed that under the collective bargaining agreement which governed Egger as a member of Local 276, the foreman on the job site, who is appointed by and represents the employer, has the exclusive right to assign work to persons on the job site. The record shows that none of the foremen whom Egger complained about were members of Local 276. Local 276 therefore cannot be held accountable for the assignment of Egger to demeaning jobs. Furthermore, Egger was, in all but possibly one instance, the most junior person at the job site. On that basis, it seems reasonable that she was assigned the lowest level jobs. As for the claim of short notice, there is nothing in the record to show that male members of Local 276 received longer notice than Egger did.

■ Finally, Egger contends that by engaging in, and acquiescing to, sexual discrimination against her, Local 276 constructively discharged or expelled[6] her from the

---

5. The guidelines read:
   Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned. 29 C.F.R. § 1604.11(f) (1985). The term employer encompasses a labor union. 29 C.F.R. § 1604.11(c) (1985).

It is apparent that the guidelines on sexual harassment apply to a union's relationship to its members and the employers with whom it has agreements as well as to persons with whom it has a traditional employer-employee relationship. Since the guidelines also apply to employment agencies and their dealings with clients, the EEOC clearly anticipated that the guidelines would apply to a variety of relationships in the workplace.

6. Although the plaintiff claims constructive discharge, I agree with defendant Local 276 that

union in violation of Title VII. 42 U.S.C. § 2000e–2(c)(1). There is a dispute over when and under what circumstances Egger left the union. Egger states that she resigned in August 1983 when she decided to join her father in a non-union shop. Local 276 states that it expelled Egger for non-payment of dues in November 1983. If Egger proves that Local 276 intentionally discriminated against her with regard to job referrals and sexual harassment, she may be able to show that Local 276 constructively expelled her from the union by rendering her membership economically useless, if not harmful, because the only work available to her was with a non-union company. *See Thurber v. Jack Reilly's Inc.*, 521 F.Supp. 238, 241 (D.Mass.1981), *aff'd on other grounds*, 717 F.2d 633 (1st Cir.1983), *cert. denied*, 466 U.S. 904, 104 S.Ct. 1678, 80 L.Ed.2d 153 (1984). Because there is a genuine issue of fact concerning the reasons for and circumstances surrounding Egger's separation from Local 276, her claim of constructive discharge or expulsion cannot be determined at this time and summary judgment should be denied on this issue.

■ In count two, Egger alleges that Max Fish violated Title VII by terminating her employment at the Brockton Hospital site and replacing her with male plumbers who were no more qualified for the job than she was. Max Fish states that it laid Egger off because there was no more work available in the area to which she was assigned. McKeown of Local 276 contends that the foreman at Max Fish told him that Max Fish was discharging Egger because she was not capable of doing the work assigned to her. This is the same foreman who allegedly told Egger he was upset to see a female plumber assigned to the job. The record shows that Egger was performing tasks below her skill level of a licensed journeyman plumber while she was working for Max Fish. Max Fish has presented no evidence as to why Egger was not rehired when it hired more plumbers a few weeks after it discharged Egger. A male

plumber who worked at the Brockton Hospital site took a week off because of lack of work and then returned to the job site. There is no evidence before the Court as to when members of Local 276 worked for Max Fish and to what areas they were assigned. Based on the foregoing, I rule that a genuine issue of fact exists concerning whether Max Fish discharged Egger because she is a female. Defendant Max Fish's motion for summary judgment as to count two should therefore be denied.

■ In count three, Egger claims that Local 276 and Max Fish engaged in a conspiracy in violation of Title VII to deprive her of her civil right to be free from discrimination because of her sex. She asserts that the defendants agreed to discriminate against her and terminate her employment with Max Fish. The term "conspiracy" when used with reference to a civil action connotes an agreement or combination to cause injury to another person or property. In this case, Max Fish avers that it never discussed the sex of any member of Local 276 with the union, or participated in the selection of members of Local 276 for employment at its job site. McKeown of Local 276 states, however, that he discussed Egger with the Max Fish foreman prior to her layoff. The defendants have failed to submit an affidavit from the foreman concerning this conversation. In his deposition McKeown is vague concerning the location and substance of his conversation with Max Fish's foreman. Although Egger has failed to present any direct evidence of a conspiracy between the defendants, it is the burden of the moving party in a motion for summary judgment to show the absence of a genuine issue as to any material fact and any doubts must be resolved against the moving party. *6 Moore's Federal Practice*, ¶ 56.11[3] (2d ed. 1986) at 56–241. I rule that the defendants have failed to foreclose the possibility that their agents agreed that Egger should be terminated from the job at Max Fish and that she should not be referred to Max Fish again because of her sex. The defendants'

the correct terminology is constructive expul- sion.

motion for summary judgment on count three should be denied.[7]

■ In count four, Egger alleges that the defendants conspired to deprive her of equal protection of the laws and equal privileges and immunities under the law because of her sex in violation of 42 U.S.C. § 1985(3). Section 1985(3) is a purely remedial statute and provides no substantive rights. *United Brotherhood of Carpenters Local 610 v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049 (1983). The rights, privileges and immunities that § 1985(3) vindicates must be found elsewhere. *Id.* In count four, Egger alleges violation of rights guaranteed by Title VII and by the Fourteenth Amendment to the United States Constitution. Section 1985(3) may not be invoked to remedy violations of Title VII. *Great American Federal Savings & Loan Ass'n. v. Novotny*, 442 U.S. 366, 378, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979). Although § 1985(3) is intended to reach conspiracies between private persons, when the substantive right which was allegedly violated is one protected by the Fourteenth Amendment some state involvement is required. *Carpenters v. Scott*, 463 U.S. at 833, 103 S.Ct. at 3358. Plaintiff Egger has not alleged any state action. Count four should therefore be dismissed.

The remaining five counts are claims based on state law. A federal court may exercise pendent jurisdiction over state law claims when there is a federal claim in the same action and the state and federal claims "derive from a common nucleus of operative facts." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). In the interest of "judicial economy, convenience and fairness to the litigants", this Court will exercise pendent jurisdiction over the state law claims in this case. *Id.* at 726, 86 S.Ct. at 1139.

In counts five and six, the plaintiff alleges that Local 276 and Max Fish respectively violated the Massachusetts Civil Rights Act, chapter 12, §§ 11H and I of the Massachusetts General Laws. Chapter 12, §§ 11H and I is a remedial statute which provides a private right of action against

> any person or persons, whether or not acting under color of law, [who] interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution and laws of the United States, or of rights secured by the constitution or laws of the commonwealth ...

Mass.Gen.Laws Ann., c. 12, §§ 11H and I. The statute was passed to supplement the protection afforded by federal civil rights legislation and to redress the deprivation of guaranteed rights by private individuals using violence or threats of violence. *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 821, 473 N.E.2d 1128 (1985). It is not preempted by Title VII. See 42 U.S.C. § 2000e–7.

■ Egger alleges that by their actions the defendants interfered with her rights guaranteed by Title VII and by chapter 152 of the Massachusetts General Laws, the workmen's compensation statute, and with her constitutional right to equal protection under the laws. In her deposition, Egger repeatedly states that she did not feel threatened or intimidated by the actions of members of Local 276 or of representatives of Max Fish. For the most part, the sexual harassment she complains about consisted of unwelcome sexual advances and verbal and physical conduct of a sexual nature. Egger did, however, report one incident which may represent a *quid pro quo* threat. It occurred some time between 1978 and 1980, during an apprentice training class in welding. John Starr, who was at that time president of Local 276 and a joint apprenticeship train-

---

7. In its memorandum to the Court, defendant Local 276 asserts that conspiracy was not part of the plaintiff's charge to the EEOC and therefore cannot be alleged in this proceeding. Local 276 has not submitted a copy of the filings before the EEOC or any other documents to support this contention.

ing coordinator, told Egger that he wanted her to come alone to his office where he had a cot. According to Egger, Starr stated that she had better be there if she wanted to stay in the union. On the basis of this representation, I rule that Local 276's motion for summary judgment as to count five should be denied. Egger has submitted no evidence of threats, intimidation or coercion by agents of Max Fish. I therefore rule that summary judgment as to count six should be granted.

In count seven, Egger alleges a claim against Local 276 for intentional infliction of emotional distress. Local 276 has moved for summary judgment in its favor on count seven, arguing that the claim is preempted by federal labor law, that the plaintiff failed to exhaust administrative remedies available under the Massachusetts fair employment practices law, chapter 151B of the Massachusetts General Laws ("Chapter 151B"), and that the claim is barred by Egger's failure to pursue remedies under the Massachusetts Workmen's Compensation Act, chapter 152. Although national labor policy embodies the principles of nondiscrimination in employment, the National Labor Relations Act ("NLRA") does not grant exclusive jurisdiction over employment discrimination claims against labor organizations to the National Labor Relations Board ("the Board"). *Emporium Capwell Co. v. Western Addition Community Org.*, 420 U.S. 50, 66, 72, 95 S.Ct. 977, 986, 989, 43 L.Ed.2d 12 (1975). There are significant differences between proceedings initiated under Title VII and those commenced under the NLRA. *Id.* at 72, 95 S.Ct. at 989. Even though the Board has a duty to prevent discrimination as it impinges on the NLRA, it is the EEOC which has the primary responsibility for actions to vindicate rights guaranteed by Title VII. *Id.* at 71–73, 95 S.Ct. at 989–90; *Graphic Arts Int'l Union, Local 280 v. N.L.R.B.*, 596 F.2d 904, 914 (9th Cir.1979). Egger was not required to proceed by filing a complaint with the Board rather than the EEOC. Her claim for intentional infliction of mental distress is not preempted by Title VII or barred by

her failure to proceed under the NLRA. 42 U.S.C. § 2000e–7; *Alcorn v. Ambro Engineering, Inc.*, 2 Cal.3d 493, 468 P.2d 216, 86 Cal.Rptr. 88 (Sup.Ct.1970) (plaintiff in employment discrimination suit may recover for intentional infliction of emotional distress).

Local 276 also argues that Egger's failure to pursue remedies under Chapter 151B and the Workmen's Compensation Act precludes her claim for intentional infliction of emotional distress. Chapter 151B was not intended to be an exclusive remedy. *Comey v. Hill*, 387 Mass. 11, 20, 438 N.E.2d 811 (1982). Although it is a comprehensive statute which bars various acts of discrimination, Chapter 151B does not eliminate an individual's common law rights. *Id.* Even though a court may award damages for emotional distress to a plaintiff who has prevailed in a suit brought under Chapter 151B, *Bournewood Hospital, Inc. v. Massachusetts Commission Against Discrimination*, 371 Mass. 303, 315–17, 358 N.E.2d 235 (1976), a person is not precluded by Chapter 151B from bringing a separate cause of action for the tort of intentional infliction of emotional distress, a tort which is not covered by the legislative scheme of Chapter 151B.

Finally, Local 276 contends that Egger should have proceeded under the Workmen's Compensation Act for any claims of emotional injury against Local 276. The exclusive remedy provision of the Workmen's Compensation Act, as it has read at all relevant times, precludes an employee covered by the Act from filing a separate claim for intentional infliction of emotional distress. Mass.Gen.Laws Ann. c. 152, § 24; *Simmons v. Merchants Mutual Insurance Co.*, 394 Mass. 1007–08, 476 N.E.2d 221 (1985). The Act defines an employee as "every person in the service of another under any contract of hire, express or implied, oral or written . . . ." Mass.Gen. Laws Ann. c. 152, § 1(4). I rule that a member of a labor organization is not an employee of that labor organization within the definition contained in the Workmen's

Compensation Act. Local 276's motion for summary judgment as to count seven should be denied.

█ In count eight, Egger alleges that Local 276's discriminatory actions toward her constituted wrongful discharge, or expulsion, from membership in the union and was a breach of an implied covenant of good faith and fair dealing as well as of public policy. Count nine alleges the same cause of action against Max Fish. The plaintiff has a motion before this Court to amend counts eight and nine to clearly set forth claims under Chapter 151B. I rule that this amendment should be allowed. No prejudice against the defendants will result from the amendment. As Local 276 stated, Chapter 151B is essentially the same as Title VII with respect to the type of claim Egger asserts and stating a violation of Title VII states a claim under Chapter 151B.[8] Pursuant to an agreement between the agencies, by filing a complaint with the EEOC, Egger effectively filed a complaint with the Massachusetts Commission Against Discrimination and thus has pursued her administrative remedies under Chapter 151B.

The cause of action alleged by Egger in counts eight and nine is covered by the provisions of Chapter 151B. Mass.Gen. Laws Ann. c. 151B, § 4(1) and (2). No similar common law action has been recognized by the Massachusetts courts. This Court cannot create a new common law action to protect a public policy already protected by the comprehensive legislative scheme found in Chapter 151B. *Melley v. Gillette Corp.*, 19 Mass.App.Ct. 511, 513, 475 N.E.2d 1227 (1985), *aff'd*, 397 Mass. 1004, 491 N.E.2d 252 (1986). Counts eight and nine may be amended to allege violations of Chapter 151B only. Summary

judgment as to counts eight and nine should be denied.

Order accordingly.

## ORDER

In accordance with memorandum filed this date, it is ORDERED:

1. Plaintiff's motion to amend counts eight and nine of her complaint is allowed.

2. Defendant's motion to dismiss count four is allowed.

3. Defendant's motion for summary judgment on count one is allowed in part; denied in part.

4. Defendant's motion for summary judgment on counts two, three, five, seven, eight and nine is denied.

5. Defendant's motion for summary judgment on count six is allowed.

---

**8.** Chapter 151B, § 4 provides, in pertinent part, It shall be an unlawful practice:
1. For an employer, by himself or his agent, because of ... sex, ... to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

2. For labor organization, because of ... sex ... of any individual ... to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer, unless based upon a bona fide occupational qualification....