**UNITED STATES DEPARTMENT OF LABOR, Plaintiff—Appellee,**

and

**United Mine Workers of America, Intervenor/Plaintiff— Appellee,**

v.

**WOLF RUN MINING COMPANY, Incorporated, Defendant— Appellant.**

No. 06–1129.

United States Court of Appeals, Fourth Circuit.

Argued: May 22, 2006.

Decided: June 28, 2006.

**ARGUED:** Albert F. Sebok, Jackson & Kelly, P.L.L.C., Charleston, West Virginia, for Appellant. Jerald S. Feingold, United States Department of Labor, Office of the Solicitor, Arlington, Virginia; Judith Rivlin, United Mine Workers of America, Fairfax, Virginia, for Appellees. **ON BRIEF:** Brian J. Moore, Jackson & Kelly, P.L.L.C., Charleston, West Virginia, for Appellant. Rita R. Valdrini, United States Attorney, Betsy C. Jividen, Assistant United States Attorney, Office of the United States Attorney, Wheeling, West Virginia; Howard M. Radzely, Solicitor of Labor, Edward P. Clair, Associate Solicitor, W. Christian Schumann, United States Department of Labor, Office of the Solicitor, Arlington, Virginia, for the Secretary of Labor. Grant Crandall, United Mine Workers of America, Fairfax, Virginia; Robert Smith, Pyles, Haviland, Turner &

Smith, Logan, West Virginia, for Appellee/Intervenor.

Before NIEMEYER, SHEDD, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge SHEDD and Judge DUNCAN joined.

NIEMEYER, Circuit Judge.

In the wake of the catastrophic Sago Mine explosion in Upshur County, West Virginia, in which 12 miners were killed and another seriously injured, the mine operator, Wolf Run Mining Company, the Secretary of Labor through the Mine Safety and Health Administration (the "Secretary" or the "Mine Safety Administration"), and the United Mine Workers of America ("UMWA" or the "Union") became enmeshed in a dispute over the protocol for investigating the cause of the explosion. By law, representatives of both the mining company and the miners are authorized to participate in any investigation conducted by the Secretary. *See* 30 U.S.C. § 813(f).

In this case, while 92 of the 97 miners at Sago Mine, which is a union-free mine, designated coworkers as their representatives, 2 miners designated the UMWA to represent them during the investigation and so advised the Mine Safety Administration. When the Mine Safety Administration began its inspection of the mine, representatives of the UMWA appeared on behalf of the two miners. Wolf Run, however, refused to permit the Union representatives to enter the mine, asserting that the Union did not have the right to be on the premises as a representative of the miners because it had not won the right to represent the miners for collective bargaining purposes and its representation of the two miners was an effort to bypass its unsuccessful efforts to unionize the mine. Wolf Run also objected to the designation of the UMWA by "anonymous" miners, i.e., miners whose names were not disclosed to Wolf Run.

The Secretary commenced this action for a temporary restraining order ("TRO"), preliminary injunction, and permanent injunction to require Wolf Run to permit the UMWA access to the Sago Mine as a miners' representative. The UMWA filed a motion to intervene, which the district court granted. Following two hearings, the district court entered a preliminary injunction, requiring Wolf Run to permit UMWA representatives access to the Sago Mine as a miners' representative.

Wolf Run filed this interlocutory appeal challenging the district court's preliminary injunction both on procedural and substantive grounds, contending that (1) it did not receive sufficient notice for the entry of a preliminary injunction as distinct from a TRO; (2) the UMWA, which does not represent the workers under procedures established by the NLRA, cannot, as a matter of law, represent miners during the investigation of a mine explosion; (3) the procedures under the Mine Safety and Health Act (the "Mine Act") for designating miners' representatives were violated when the Mine Safety Administration accepted the designation of the Union from "anonymous" miners; and (4) the injunction deprived Wolf Run of its right to freedom from an unlawful invasion of its property.

Analyzing Wolf Run's contentions in the context of our interlocutory review of a preliminary injunction, we conclude that even though the anonymous designation of miners' representatives raises a serious legal question that has not been decided in the courts, the district court did not abuse its discretion in entering the preliminary injunction. Accordingly, we affirm.

## I

On January 2, 2006, an explosion occurred at Wolf Run's Sago Mine in Upshur County, killing and injuring miners who were working the mine. The mine was closed pending an investigation by the Secretary, along with state inspectors from West Virginia's Office of Miners' Health, Safety, and Training. Under the Mine Act, the Secretary is authorized to inspect the mine to investigate the cause of the explosion. 30 U.S.C. § 813(a). The Mine Act also provides that a representative of the mine operator and a representative of the miners may participate in the investigation. *Id.* § 813(f). Regulations promulgated under the Mine Act define a representative of the miners as "any person or organization which represents two or more miners." 30 C.F.R. § 40.1(b)(1).

Approximately two weeks after the explosion, on January 17, 2006, the UMWA filed two documents with the Mine Safety Administration, allegedly evidencing the UMWA's designation by two miners as a miners' representative under § 813(f). The first, entitled "Filing Information for Representatives of Miners," was signed by three representatives of the UMWA, and the second, entitled "Confidential Designation," which called for the signature of a miner, was unsigned. The names of two miners were, however, given to Mine Safety Administration personnel. The Mine Safety Administration's District Manager verified that the two miners orally identified by the Union were actually employed at the mine and wished to have the Union represent them. He also received "Confidential Designations" from the two miners, signed by them and designating the UMWA as their representative. While the documents filed by the UMWA with the Mine Safety Administration were turned over to Wolf Run, as required by 30 C.F.R. § 40.2(a), the documents signed by the two miners given directly to the Mine Safety Administration's District Manager by the miners were not. Wolf Run objected to the validity of the designation, contending that it was illegally denied the right to verify whether two or more miners properly designated the UMWA as their representative.

At 3:30 p.m. on January 25, 2006, Mine Safety Administration personnel went to the Sago Mine to begin the underground portion of the investigation. Wolf Run agreed to admit Mine Safety Administration personnel to the mine, along with the Sago miners designated as miners' representatives by their coworkers, but it refused to permit UMWA personnel to enter. The Mine Safety Administration suspended the investigation and immediately filed this action for a TRO, preliminary injunction, and permanent injunction to require Wolf Run to permit representatives of the UMWA access to the Sago Mine as a miners' representative.

The district court conducted a hearing that same day at 4:10 p.m. Before the hearing, the parties exchanged briefs, and after the hearing, the court broke to undertake some research and scheduled a second hearing for 10:00 a.m. the next morning, January 26, 2006. To do so, it entered an order announcing that the court would reconvene on January 26 "with respect to the Secretary's Application for the issuance of a Temporary Restraining Order or Preliminary Injunction."

Before the hearing on January 26, 2006, the parties exchanged supplemental briefs. At the hearing, the court, in noting receipt of the supplemental briefs, referred to the proceeding as one "seeking a Temporary Restraining Order." At the end of the second hearing, the court announced that it would issue an injunction effective until "further notice through Order of this

Court." When Wolf Run objected because the order was not limited to 10 days, as required by Federal Rule of Civil Procedure 65 for a TRO, the court stated, "While the motion was for a temporary restraining order ... the preliminary injunction provisions are best served in this matter."

The court entered the formal order that same day pursuant to the Secretary's motion for "a temporary restraining order or preliminary injunction," enjoining Wolf Run, "until further notice or Order of this Court from refusing to permit the UMWA, as a representative of miners pursuant to 30 U.S.C. § 813(f), to accompany representatives of the Secretary of Labor on any physical inspection or investigation of the Sago Mine and to participate in pre— and post-investigation conferences at the mine site, when so requested by an authorized representative of the Secretary of Labor." The court concluded its order with the statement, "[T]his Order shall be considered a preliminary injunction."

After the district court denied Wolf Run's motion for a stay, Wolf Run filed this appeal.

## II

Unlike a permanent injunction, which resolves the merits of a claim and imposes an equitable remedy because a legal one is inadequate, *see eBay, Inc. v. MercExchange, LLC,* —— U.S. ——, ——, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006), a preliminary injunction maintains a particular relationship between the parties *in anticipation* of a decision on the merits, pending completion of the litigation. Because a preliminary injunction is temporary and is entered with only a preview evaluation of the merits, without resolving them, the decision to enter a preliminary injunction involves consideration of the relative harms to the parties in maintaining a

particular status between them until completion of the case. In addition, because of the extraordinary nature of a remedy entered before the merits are decided, the test for entering a preliminary injunction looks beyond the immediate dispute to determine whether such an invocation of equity is in the public interest. We have thus articulated the test for a preliminary injunction as follows:

> In entering a preliminary injunction, a court must consider the following *Blackwelder* factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.

*Ciena Corp. v. Jarrard,* 203 F.3d 312, 322 (4th Cir.2000) (citing *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 193–94 (4th Cir.1977)) (internal quotation marks and citations omitted).

 In this case, the harm to a party by granting or denying a preliminary injunction is essentially the same as the consequence to a particular party in winning or losing on the merits. By the entry of a preliminary injunction, the two miners are authorized to designate the UMWA as their representative and the Secretary will have the benefit of the UMWA's assistance during the investigation. By the denial of a preliminary injunction, the two miners are denied representation by the UMWA, and the Secretary will have the benefit of whatever other representative the miners designate. The harm to Wolf Run is only harm if Wolf Run is correct on the merits. If the Union was properly designated a miners' representative, Wolf Run suffers no legally cognizable harm by being required to permit it to accompany the Secretary during the investigation.

In any case, the relative harms are minimal on both sides. In the absence of an injunction, the Secretary would lose the benefit of the Union's assistance but would not be prevented from conducting the investigation. The injunction requires Wolf Run to permit the UMWA to accompany the Secretary during the investigation, but the Union does not have unfettered access and will always be accompanied by a representative of Wolf Run.

Because the investigation may be completed before the litigation is completed, the decision to grant a preliminary injunction may effectively decide the merits of the case. This might have been one of those cases where the district court, by amplifying the process to a minor degree, could have decided the case finally under Federal Rule of Civil Procedure 65(a)(2). But inasmuch as its decision was only preliminary, our review essentially focuses on whether the district court's preliminary review *of the merits* led to an abuse of discretion, because an independent review of the relative harms in this particular case would tend to collapse into a review of the district court's preliminary view of the merits. Accordingly, we will address the issues, articulated as follows:

(1) Did the district court err in entering a preliminary injunction, rather than a TRO, in view of the notice given in this case?

(2) Did the district court abuse its discretion in entering a preliminary injunction based on its preliminary legal rulings: (A) that the miners' anonymous designation of the UMWA does not fatally affect their designation; (B) that a labor organization can represent two or more miners for a mine explosion investigation even though the organization is not the elected representative of the miners for collective bargaining; and (C) that the UMWA can enter the mine operator's property to carry out its functions as a miners' representative?

We address these seriatim.

### III

■ As a procedural matter, Wolf Run contends that it did not receive notice adequate under Federal Rule of Civil Procedure 65(a)(1) to authorize the district court to enter a preliminary injunction.[1] Rule 65, which governs injunctions, provides that "no preliminary injunction shall be issued without notice to the adverse party." Wolf Run asserts that it received less than 24 hours' notice. To decide whether the notice was adequate, we determine whether Wolf Run had a fair opportunity to oppose the application for an injunction. *See Ciena,* 203 F.3d at 319.

The parties apparently anticipated their dispute before this action was commenced. They began exchanging information about who would be participating in the explosion investigation on January 18, 2006, and Wolf Run began the preparation of its list of miners electing to represent themselves on January 19, a list that it attached to its papers filed in this action. And on January 25, 2006, when the action was commenced (apparently after 3:30 p.m.) and a hearing was scheduled to begin at 4:00 p.m., Wolf Run was apparently ready with its opposition to an injunction; it filed its brief before the hearing, including attachments demonstrating facts relevant to ar-

---

1. A preliminary injunction, which may be entered only after notice, is distinguished from a TRO, which may be entered without notice, only by its duration—a preliminary injunction is of indefinite duration extending during the litigation, while a TRO is limited in duration to 10 days plus one 10–day extension. *Compare* Fed.R.Civ.P. 65(a) *with* Fed.R.Civ.P. 65(b).

guments to be presented at the hearing. The hearing actually began at 4:10 p.m.

During the course of the January 25 hearing, the court received arguments from all parties including the UMWA and asked numerous questions. After each party had completed its arguments, the court concluded the proceedings with the following exchange.

> The Court: Let's take this matter under—the Court an opportunity to look into some of the questions of law that you gentlemen have so very professionally raised in this case. The Order can be entered letting the United Mine Workers of America to become a party to this litigation. Would it be too quickly for us to suggest a temporary order and the issues that are applicable to it say tomorrow morning at 10:00?
>
> \* \* \* \* \* \*
>
> [Counsel for Wolf Run]: That would be fine, Your Honor.
>
> [Counsel for the Secretary]: That would be fine, Your Honor.
>
> [Counsel for UMWA]: Certainly.
>
> The Court: All right. Let's do that and the Court can look into the basic issue that counsel has very appropriately raised so that we will not be violating, or limiting, or misdirecting any rule of law that would be beneficial.

Thus, without objection, the court reconvened at 10:00 a.m. on January 26, by which time the parties had submitted supplemental briefs. At the January 26 hearing, further arguments were made by all parties. Wolf Run made essentially two: (1) that the UMWA cannot be a miners' representative "based on two anonymous individuals," particularly when Wolf Run presented evidence that "92 of the 97 active miners ... want to represent themselves," and (2) that the UMWA, as an affiliate of the AFL–CIO, was not an appropriate designee of two miners because "all of this is brought about because the UMWA does not like Wolf Run's ultimate parent, ICG, because its subsidiaries are 100% union-free.... 92 [employees] ... don't want the UMWA there. They want to represent themselves."

After the parties' issues were argued to completion, the district court indicated that it would enter an injunction allowing the UMWA to represent two miners during the course of the investigation and that it would enter an injunction enforcing that ruling. At that point, Wolf Run objected as follows:

> Your Honor, just on the Order, we would just obviously, the objection we have in general, but just the—the question of again, we believe this is a TRO and we do think it should be of a—a limited duration. And the rules refer, Rule 65, to 10 days. So, I mean, to the extent that it is of unlimited duration, we don't think it complies with that rule. I just want to mention, at least, note that objection.

In response, the court stated that it believed that "the preliminary injunction provisions are best served in this matter," and the court accordingly entered a preliminary injunction on January 26, 2006.

During the course of the proceedings on January 25 and 26, Wolf Run never complained about an inadequacy of notice; never complained about an inability to present facts, an affidavit, or a witness; and never complained about an inability to present a legal argument. Indeed, a review of the record reveals that all parties were apparently satisfied with the completeness of their presentations, and the court similarly observed:

> Well, thank you all very much. Your briefs have been very, very well drafted and presented. You certainly have expressed in detail the position of your

respective clients, they can be very proud of the manner in which you have represented them.

The inadequacy of notice for the entry of a preliminary injunction was made by Wolf Run for the first time on appeal.

Rule 65 does not define what constitutes adequate notice for the entry of a preliminary injunction. In *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974), the Supreme Court held that the notice in the case before it was inadequate when it was given by telephone to the adverse party on the same day that counsel was served with all the documents and the hearing was held. The Court stated, "The notice required by Rule 65(a) before a preliminary injunction can issue implies a hearing in which the defendant is given *a fair opportunity to oppose the application* and to prepare for such opposition." *Id.* at 434 n. 7, 94 S.Ct. 1113 (emphasis added). The Court concluded that the same-day notice in that case did "not suffice." *Id.; see also Ciena*, 203 F.3d at 319.

■ The notice requirement thus is more substantive than technical, requiring that a defendant be given "a fair opportunity to oppose the application," as distinct from a specified number of hours or days. *See Ciena*, 203 F.3d at 319. In that regard we have noted that "broad discretion is given to the district court to manage the timing and process for entry of all interlocutory injunctions—both TROs and preliminary injunctions—so long as the opposing party is given a reasonable opportunity, commensurate with the scarcity of time under the circumstances, to prepare a defense and advance reasons why the injunction should not issue." *Id.* In *Ciena*, we held that the district court could properly consider a motion for a TRO as a request for a preliminary injunction, based on the fluidity of the relationship between TROs

and preliminary injunctions, focusing not on a specific time period but on whether the opposing party had a fair opportunity to oppose it. *Id.*

The Secretary contends first that Wolf Run waived its argument for inadequate notice by failing to complain about a lack of adequate notice in the district court. While Wolf Run did object to entering a TRO of indefinite duration, noting that a TRO may be entered for only 10 days, it did not complain about an inadequacy of notice, even after the Secretary argued to the court that a preliminary injunction was appropriate "since notice was provided to the adverse party."

■ Generally, an issue raised for the first time on appeal will not be considered, unless the refusal to consider it would result in a fundamental miscarriage of justice. *Muth v. United States*, 1 F.3d 246, 250 (4th Cir.1993). Wolf Run has not advanced any reason why the shortness of notice below prejudiced it to such a degree as to constitute a fundamental miscarriage of justice. *See Friends of Iwo Jima v. National Capital Planning Commission*, 176 F.3d 768, 774 (4th Cir.1999). Wolf Run was able to submit two briefs with numerous attachments to establish facts, and it was able to make all of its arguments. Moreover, there was nothing in the timing or the nature of the proceedings that precluded it from calling witnesses had it so desired. There was not only a hearing on the day the action was commenced, but also one on the next day, with an intervening evening for preparation. This course of proceeding, while abbreviated, did not amount to a miscarriage of justice that would justify our recognizing it as an issue on appeal when it was complained about for the first time on appeal.

■ In addition to her waiver argument, the Secretary contends that in any

event the notice given was adequate. We agree. Wolf Run received notice that the Secretary was seeking a preliminary injunction and was able to file an opposition to it, making all of its arguments. The Secretary's filing was captioned "Application for Temporary Restraining Order and Complaint for Preliminary and Permanent Injunction," and the prayer for relief requested both a TRO and a preliminary and permanent injunction—all of which notified Wolf Run that a preliminary injunction was on the table. Indeed, Wolf Run itself concluded its brief in opposition by stating, "Plaintiff cannot meet any of the requirement[s] *for a preliminary injunction* under Fourth Circuit law." (Emphasis added). Moreover, at the January 25 hearing, the district court announced, "Now, the application for Temporary Restraining Order and the Complaint for Preliminary and Permanent Injunction is now before the Court," and when it scheduled the January 26 hearing, its order announced that the hearing was on "the Secretary's Application for the issuance of a Temporary Restraining Order or Preliminary Injunction." While it is true that Wolf Run argued at the end of the second hearing that the court should have only considered the application insofar as it requested a TRO, that argument was advanced solely to limit the duration of the injunction and not to contend that Wolf Run did not have a fair opportunity to respond to the motion for the injunction.

In these circumstances, we conclude that Wolf Run had a fair opportunity to oppose the injunction and that the district court did not abuse its discretion in electing to enter a preliminary injunction in lieu of a TRO. In addition, we note that the district court assured Wolf Run that if it had anything further, it could present the matter in the ongoing proceedings. As the court stated:

Now if there becomes an abuse of time in this matter by anybody, you come to the Court and we'll act—act on it and take it under consideration and we can resolve the problem one way or the other, whatever is fair and just for everybody.

IV

■ The Mine Act requires that the Mine Safety Administration conduct inspections and investigations, including investigations of mine accidents. *See* 30 U.S.C. § 813(a). The question in this case is not about mine safety or whether an investigation of the Sago Mine explosion should take place, or even whether the mine operator and the miners can have representatives present during the investigation. Rather, the issue reduces essentially to a matter of protocol, centering on how the interests of the mine operator and the miners are to be represented during an investigation of an explosion.

The Mine Act provides:

Subject to regulations issued by the Secretary, a representative of the operator and a representative authorized by his miners shall be given an opportunity to accompany the Secretary [during inspections and investigations].

30 U.S.C. § 813(f). The Secretary has promulgated regulations pursuant to this section, defining a representative of miners to mean "[a]ny person or organization which represents two or more miners at a coal or other mine for the purposes of the Act." 30 C.F.R. § 40.1(b)(1). A person or organization designated as a representative of miners must fulfill the requirements of § 40.2, which provide in part:

(a) A representative of miners shall file with the Mine Safety and Health Administration District Manager for the district in which the mine is located the information required by § 40.3 of this

part. Concurrently, a copy of this information shall be provided to the operator of the mine by the representative of miners.

\* \* \* \* \* \*

(c) All information filed pursuant to this part shall be maintained by the appropriate Mine Safety and Health Administration District Office and shall be made available for public inspection.

30 C.F.R. § 40.2(a), (c). The information required by § 40.3 includes, as relevant here:

(1) The name, address, and telephone number of the representative of the miners . . . .

(2) The name and address of the operator of the mine where the represented miners work . . . .

(3) A copy of the document evidencing the designation of the representative of miners.

30 C.F.R. § 40.3(a)(1)-(3).[2]

There is no provision that limits who may be the "person or organization which represents two or more miners."

The Secretary has provided the court with copies of two forms that it has created and made available to miners' representatives for filing. One form, entitled "Filing Information for Representatives of Miners," calls for the information required by 30 C.F.R. § 40.3(a)(1), (2), (4), (5), and (6), and includes the statement, "I [the representative] further certify that the *accompanying document* designat[es] the above listed as representatives of miners at the mine listed above." The second form, presumably the "accompanying document" referred to in the first form and entitled "Confidential Designation," provides evidence of the designation by a miner, as required by § 40.3(a)(3), and states, in essence, "I [miner] designate [Representative] and any other safety representative designated by [Representative] to serve as my representative." The second document also states that the employee may have his name remain confidential and not be disclosed to the mine operator.

To authorize her receiving miners' names in confidence, the Secretary points to the preamble to the regulations, 43 Fed. Reg. 290508, 290509 (July 7, 1978), which states—in response to a comment that the designation should be filed with the national office rather than the district manager

---

2. 30 C.F.R. § 40.3(a) provides in full:

(a) The following information shall be filed by a representative of miners with the appropriate District Manager, with copies to the operators of the affected mines. This information shall be kept current:

(1) The name, address, and telephone number of the representative of miners. If the representative is an organization, the name, address, and telephone number of the organization and the title of the official or position, who is to serve as the representative and his or her telephone number.

(2) The name and address of the operator of the mine where the represented miners work and the name, address, and Mine Safety and Health Administration identification number, if known, of the mine.

(3) A copy of the document evidencing the designation of the representative of miners.

(4) A statement that the person or position named as the representative of miners is the representative for all purposes of the Act; or if the representative's authority is limited, a statement of the limitation.

(5) The names, addresses, and telephone numbers, of any representative to serve in his absence.

(6) A statement that copies of all information filed pursuant to this section have been delivered to the operator of the affected mine, prior to or concurrently with the filing of this statement.

(7) A statement certifying that all information filed is true and correct followed by the signature of the representative of miners.

so that the identity of the designating miners could be kept confidential—that the document evidencing the designation does not necessarily have to list the names of the designating miners. Since issuing the regulations in 1978, the Secretary has interpreted the regulations to permit anonymous designations.[3]

In this case, the Secretary asserts that the two miners designating the UMWA did not wish to have their names disclosed to Wolf Run, and the Mine Safety Administration has accommodated that request. The facts about how that was accomplished remain somewhat murky in the current record. At one point, the Mine Safety Administration stated that it was never given *a written document* by which the two miners designated the UMWA as their representative, asserting that the Mine Safety Administration was only given the first document, which provides the representative's name and address and the coal operator's name and address. After oral argument, however, the Mine Safety Administration corrected that information, advising the court that the UMWA filed both forms, but that the second form designating the UMWA as a miners' representative was not signed by the miners. The Mine Safety Administration reported, however, that the miners themselves supplied the signed designations directly to it, with the request that their identity be kept confidential. The Mine Safety Administration now asserts that the District Manager of Coal District 3 "maintains these signed documents under lock and key" and confirms that they have not been provided to Wolf Run.

In these circumstances, the Secretary takes the position (1) that the first document filed by the UMWA, giving the names and addresses of it and the coal operator, was adequate to fulfill the requirements of 30 C.F.R. § 40.3, and that Wolf Run thus received a copy of the document evidencing the designation of UMWA as the miners' representative; or alternatively (2) that even if the single document was not evidence of designation, the Mine Safety Administration is authorized to keep the second document containing the actual names of the miners anonymous when the miners have so requested.

As a result, Wolf Run has not been given a copy of the miners' signed designation, although it has been provided a copy of the first document filed by the UMWA, which gives its own name and address as well as the name and address of Wolf Run. Wolf Run contends that this "anonymous" designation violates the regulations and that the violation denies it the ability to verify for itself that the UMWA is properly designated and remains so designated throughout the investigation. It posits the possibility that if one of the miners were to leave his employment with Wolf Run for whatever reason, it would have no way of knowing that the UMWA had lost its authority to participate in the investigation.

The Mine Safety Administration has assured the court that two miners have designated the UMWA to be their representative and that these two miners currently work at the Sago Mine. For now, Wolf Run does not contest these facts. Its argument challenges whether the procedure created by the statute and regulations was

---

**3.** The Secretary's interpretation of her own regulations is generally entitled to substantial deference *unless* it is plainly erroneous or inconsistent with the regulation. *See Dist. Mem'l Hosp. of S.W. N.C., Inc. v. Thompson,* 364 F.3d 513, 517 (4th Cir.2004) (citing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)).

followed in this case and questions how it will remain protected by the Mine Act.

Section 40.3(a) of the regulations provides a list of information that must be *filed* by the UMWA and "kept current," including (1) its name and address, (2) the mine operator's name and address, and (3) "a copy of the document evidencing the designation of it as the representative of the miners." The regulation also requires that any document filed by the representative with the Mine Safety Administration "shall be made available for public inspection," *see* § 40.2(c), and copies of them must be provided to the mine operator, *see* §§ 40.2(a), 40.3(a)(6). A natural, straightforward reading of these regulations might lead to the conclusion that the designation of UMWA that was signed by the miners must be filed with the Mine Safety Administration and thereafter be made available to the mine operator. The Secretary argues, however, that its first form (containing the names and addresses of the miners' representative and the miner operator) fulfills the requirement of § 40.3(a)(3) because that form contains the sentence: "I further certify that the accompanying document designat[es] the above listed as representative of miners at the mine listed above." Whether that reference in the first form "evidences" the miners' designation or merely refers to the evidence of their designation is something we do not decide today.

In this case, moreover, the UMWA did not file a copy of the miners' designation form—the miners themselves did. This leaves open the question of whether the UMWA complied with the regulations by not filing the documents itself, possibly in order to avoid having to produce the document to the mine operator.

At this preliminary stage of the litigation, we need not resolve these issues, and they remain for the district court to decide. It is sufficient at this preliminary stage to rely on the facts that two miners did in fact designate UMWA as their representative and that the two miners currently work at the Sago Mine. Whether the formalities of designation have been complied with does not for now deny the miners the benefit of the designation, although such a question could well become material as the litigation progresses.

We conclude that the district court could rely on these facts to support the exercise of its discretion in entering the preliminary injunction in this case.

## V

◼ Wolf Run also contends, as what would appear to be its principal concern, that a labor union which has been unsuccessful in winning the right to represent its employees may not, under the Mine Act, be designated by two employees, contrary to the will of the majority of the miners. It contends that because the UMWA is a labor organization, Wolf Run is not entitled to bargain or deal with it on behalf of the miners for any purpose unless the organization represents a majority of the workforce. To do so, it argues, would constitute an unfair labor practice. *See* 29 U.S.C. § 158(a)(2). *Cf. Emporium Capwell v. Western Addition Community Org.*, 420 U.S. 50, 70, 71, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (holding that no rights granted to individuals under Title VII are capable of abrogating the provisions of the NLRA).

Wolf Run also maintains that the UMWA's motives are transparent and that its wish to serve as a miners' representative under the Mine Act is little more than an effort to get its foot in the door and begin organizing the miners at Sago Mine. It contends that the UMWA's effort to "infiltrate its mine for purposes other than

those contemplated by the Mine Act" is evidenced by a letter sent by the AFL–CIO to the Securities and Exchange Commission requesting that ICG, the ultimate parent of Wolf Run, be investigated for security violations. Wolf Run claims that the letter demonstrates that "the union is launching a broad-based campaign against ICG, whose subsidiaries are 100% union-free."

The true purposes attributed by Wolf Run to the Union should not be too readily dismissed, because, as Justice Scalia observed in his concurring opinion in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (Scalia, J., concurring):

> [C]ompliance [with the Mine Act] will compel the company to allow union officials to enter [the company's] premises (and in a position of apparent authority, at that), notwithstanding [the company's] common-law right to exclude them ... [a]nd compliance will provide at least some confidential business information to officers of the union.

But these are arguments that should be advanced to Congress to modify the Mine Act and the regulations promulgated under it. As now written, the Act does not, in any way, restrict who may serve as a miners' representative, and the regulations under the statute define "miners' representative" as "*any person or organization* which represents two or more miners." 30 C.F.R. § 40.1 (emphasis added). Thus, it appears that while an organization may exist to represent miners for collective bargaining, nothing on the face of the Mine Act or its regulations bars such an organization from being designated as a miners' representative for mine inspections and investigations when at least two miners make that designation.

Wolf Run does not take the position that the regulation itself is illegal; rather, it argues that the regulation must be read together with the NLRA and when that is done, one must conclude that a union cannot act as a miners' representative under the Mine Act for miners it does not represent for purposes of collective bargaining. Interpreting the law otherwise, it argues, would approve the selection of a union as a miners' representative under the Mine Act in circumstances that would readily lead to an abuse by the union of its role in a nonunion shop where a majority of the workers have not designated it as its representative for collective bargaining purposes. This argument assumes that it is inevitable that the union will abuse its limited role as a miners' representative. Wolf Run has so far advanced no evidence to suggest such abuse has occurred or is likely to occur, and remedies are available if it does. While it may be a reason to subject the UMWA to greater scrutiny in its performance of its role as a miners' representative under the Mine Act, we do not decide, at this preview of the merits, that the UMWA's status as a labor organization seeking to organize Sago Mine precludes the UMWA from performing as a miners' representative.

Despite the potential problems created by the designation of the UMWA as a miners' representative, we can find no legal limitation in the statute or the regulations that deny such an organization from representing two or more miners as a miners' representative. Wolf Run simply cannot contend that the UMWA is not an "organization" as that term is used in 30 C.F.R. § 40.1.

At this point in the litigation, we need only be satisfied that in entering the preliminary injunction, the district court did not abuse its discretion. Without statutory or regulatory language limiting the word "organization" to exclude labor unions as representatives for miners under

the Mine Act, we yield to the preliminary interpretation of the district court, recognizing that it is also the interpretation of our fellow circuits in *Thunder Basin Coal Co. v. Federal Mine Safety and Health Review Commission,* 56 F.3d 1275 (10th Cir.1995), and *Kerr–McGee Coal Corp. v. Federal Mine Safety and Health Review Commission,* 40 F.3d 1257 (D.C.Cir.1994).

## VI

█ Finally, Wolf Run contends that ordering the UMWA on to its property as the miners' representative would violate its common law property rights, as recognized in *Lechmere, Inc. v. National Labor Relations Board,* 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992). In *Lechmere,* the Court held that the NLRA confers rights only on employees, not on unions, and that an employer cannot be compelled to allow nonemployee organizers on its property to distribute handbills.

The holding in *Lechmere,* however, is inapposite to the access afforded by the Mine Act in this case. The Mine Act authorizes the Mine Safety Administration to conduct inspections and investigations on a mine operators' property, particularly the mine. Wolf Run has not contended that such an authorization by the Mine Act violates the law. Yet, as part of that authorization, Congress has also authorized mine operators and miners to have their representatives participate in such inspections and investigations. If the UMWA is properly designated as a miners' representative under 30 U.S.C. § 813(f) and 30 C.F.R. § 40.1, then it is explicitly authorized to enter the mine for the limited purposes articulated in the Mine Act. While a union may not have rights to enter the employer's property under the NLRA, miners do have a right to designate representatives to enter the property under the Mine Act.

## VII

This litigation is at the very early stages, involving our review of a preliminary injunction that directed Wolf Run to allow the UMWA to serve as a miners' representative in the ongoing investigation of the Sago Mine explosion. At this point, the driving currents of this appeal relate more to the parties' collateral and future concerns about the investigation than the investigation itself. The mine operator worries that the UMWA will use its role as a miners' representative to advance its created purpose of organizing miners, and the Mine Safety Administration and UMWA worry that Wolf Run will retaliate against two miners who have designated the UMWA to represent their interests during the investigation. In the absence of direct evidence to support these concerns at this point, however, they remain only speculative.

In entering the preliminary injunction, the district court did not decide the merits of the case. But it did find that the Secretary has established a sufficient likelihood of success on the merits, which, when combined with the relative harms to the parties and the public interest in proceeding promptly with the explosion investigation, justified issuing a preliminary injunction. In balancing the relative harms, evaluating the likelihood of success, and discerning the public interest, we conclude that the district court did not abuse its discretion. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir. 1991).

*AFFIRMED*